1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY CAMPBELL, SANDRA JEFFCOAT, NOLAN CAMPBELL, MARGARET CAMPBELL, ANTHONY CAMPBELL, JR.,            ) ) ) ) ) | CIV F 04-5585 AWI TAG<br><br>ORDER ON DEFENDANTS'S MOTION FOR SUMMARY JUDGMENT |

ANTHONY CAMPBELL, SANDRA )        CIV F 04-5585 AWI TAG
JEFFCOAT, NOLAN CAMPBELL,     )
MARGARET CAMPBELL, ANTHONY )    ORDER ON DEFENDANTS'S
CAMPBELL, JR.,                )        MOTION FOR SUMMARY
                             )        JUDGMENT
          Plaintiffs,        )
    v.                       )
                             )
CITY OF BAKERSFIELD, MARK    )
CHARMLEY, SCOTT CARVEL,       )
ORBIN LOVE, THOMAS PRYOR,     )
JAMES JAMES, ERIC MATLOCK, and )
DOES 1-10 Individually and in their )
Official Capacities,         )
                             )
          Defendants.        )
_____)

        This is a civil rights case that stems from the search of the home of Plaintiff Anthony

Campbell ("Campbell") and the vehicle of Plaintiff Sandra Jeffcoat ("Jeffcoat").  Anthony

Campbell, Jr., Margaret Campbell, and Nolan Campbell and James James are no longer parties to

this action.  Campbell and Jeffcoat (collectively "Plaintiffs") are proceeding pro per.  Plaintiffs

allege nine violations of 42 U.S.C. § 1983.  Campbell alleges violations of the Fourth

Amendment for an unreasonable search and false arrest/false imprisonment, Fourteenth

Amendment claims for malicious prosecution, abuse of process, and interference with familial

relationships, conspiracy, *Monell* liability, *City of Canton* liability, and *Larez* liability.  Jeffcoat

1   alleges Fourth Amendment violations for unreasonable search and seizure.  Defendants have

2   moved for summary judgment on all claims.  Defendants's motion will be granted in part and

3   denied in part.

4

5                              **FACTUAL BACKGROUND**

6          On April 20, 2000, Bakersfield Police Department Detective Mark Charmley

7   ("Charmley") received a telephone call from a reliable confidential informant regarding a

8   purchase of a large quantity of Iodine Tincture 7% from a farm supply store.  Defendants's

9   Undisputed Material Facts ("DUMF") No. 1.  The reliable confidential informant identified

10  Anthony Campbell as the person who purchased the Iodine Tincture 7%.[1]  DUMF No. 2.  The

11  confidential informant was familiar with the clientele of the specialized retail shop and did not

12  believe that Campbell was a large animal farmer.  DUMF No. 3.  As such, the confidential

13  informant notified the Bakersfield Police Department of Campbell's purchase of approximately 1

14  liter of  Iodine Tincture 7%.  Id.  The confidential informant had provided the Bakersfield Police

15  Department successful narcotic tips several times before.  DUMF No. 4.  Due to the reliable

16  confidential informant's information, Charmley ordered a "moving surveillance" of Campbell.

17  DUMF No. 5.

18         After Campbell left the farm supply store, the Bakersfield Police Department followed

19  him to the Food Maxx store located at Niles and Fairfax in Bakersfield.  DUMF No. 6.  Detective

20  Scott Carvel ("Carvel") observed Campbell enter the Food Maxx grocery store.  Id.  Carvel

21  observed Campbell purchase four bottles of hydrogen peroxide at the FoodMaxx grocery store

22

23  _____

24      [1]Prior to the current opposition, Campbell had filed a Rule 56(f) opposition and requested additional time in
    which to learn the name and history of the confidential informant.  However, Campbell's motion did not meet the
25  requirements of Rule 56(f).  Moreover, the Court granted Campbell additional time to file an opposition and,
    irrespective of the informant's identity, the result of Defendants's motion would not change.  Campbell's prior Rule
26  56(f) request is denied.  See Fed. R. Civ. Pro. 56(f); Employers Teamsters Local Nos. 175 & 505 Pension Trust
    Fund v. Clorox Co., 353 F.3d 1125, 1129-1130 (9th Cir. 2004); State of California v. Campbell, 138 F.2d 772, 779
27  (9th Cir. 1998); Schwarzer, Tashima, Wagstaffe, Cal. Practice Guide: Fed.Civ.Pro. Before Trial, § 14:115 (The
    Rutter Group 2005).

28                                          2

located at Niles and Fairfax in Bakersfield, CA.  DUMF No. 7.  Carvel  interviewed the manager

of the Food Maxx store, Andrea Johnson, to confirm that Campbell  purchased four bottles of

hydrogen peroxide.   DUMF No. 8.  Andrea Johnson provided Carvel a receipt of Campbell's

purchase confirming his purchase of four bottles of hydrogen peroxide.  DUMF No. 9.  When

Campbell exited the Food Maxx grocery story, members of the surveillance team observed him

place four bottles of hydrogen peroxide in the trunk of his vehicle.  DUMF No. 10.

Det. Charmley understood that the quantity of Iodine Tincture 7% and hydrogen peroxide

purchased by Campbell are ingredients used in manufacturing methamphetamine.  DUMF No.

11.  Because Charmley  believed that Campbell was likely manufacturing methamphetamine by

using a clandestine laboratory, he sought and obtained a search warrant.  DUMF No. 12.  The

affidavit outlined the basis of Charmley's belief that probable cause existed for the court's

issuance of a search warrant for Campbell's home, vehicle and person.  DUMF No. 13.  Based on

Charmley's and the informant's affidavit, Judge "Skip" Staley found probable cause for the

issuance of a search warrant.  DUMF No. 14.  The search warrant authorized the search of

Campbell's home, vehicle and person.  DUMF No. 15.

On April 20, 2000, Det. Charmely was the case agent for the search at Plaintiffs's home.

DUMF No. 16.  Charmley represented to the officers who were to conduct the search that he

obtained a search warrant authorizing the search of Campbell's home, vehicle  and person.

DUMF No. 17.  Charmley conducted an operation briefing before the execution of the search

warrant to advise the participating officers of the purpose and breadth of the search.   DUMF No.

18.  Officers Carvel, Thomas Pryor ("Pryor") and James James took part in the operation

briefing.  DUMF No. 19.  Sgt. Orbin Love ("Love") remained "on point" during the operation

briefing to maintain visual surveillance of Campbell's home until the search commenced.

DUMF No. 20.  During the search, Love participated in his capacity as a Certified Bakersfield

Police Department Vice/Narcotics Clandestine Laboratory Investigator.  DUMF No. 21.  Sgt.

Pryor supervised the search as the ranking officer at the scene.  DUMF No. 22.  Carvel guarded

Campbell and Jeffcoat during the search.  Id.  Officer James helped in the search of plaintiffs' home.  Id.  The approximate footage of the Campbell home is 1,250 square feet.  DUMF No. 72. The approximate footage of the total area of the Campbell property located at 5401 ½ Rosewood Avenue, Bakersfield, California is about 10,800 square feet.  Id.

Det. Charmley informed Campbell and Jeffcoat that he had a search warrant and that he was seeking evidence of illegal manufacture of methamphetamine.  DUMF No. 24.  During the search, Campbell and Jeffcoat were handcuffed and sat on their couch inside of the living room. DUMF No. 25.  Because Jeffcoat was a potential suspect, Carvel could not allow Jeffcoat to use the toilet without a female officer to accompany her.  DUMF No. 23.  As a matter of practice, Carvel regularly requested that a female officer respond to a search or arrest where a female subject requested to use the toilet.  Id.  On this occasion, a female officer did not respond to the Campbell residence.  Id.  Jeffcoat did not suffer any permanent or long term injury from the denial of her request to use the toilet. DUMF No. 73.

Love observed opened and unopened bottles of hydrogen peroxide and iodine tincture 7% bottles inside Campbell's home.  DUMF No. 26.  In the kitchen, Love located a green plastic trash bad that contained several discarded boxes of Triphed brand cold and nasal tablets.  DUMF No. 27.  Love found approximately 14 used blister packs that were apparently removed from the empty Triphed boxes.  DUMF No. 28.  The manufacture of methamphetamine includes the processing of over-the-counter cold medicines such as Triphed.  Id.  Love observed a can of denatured alcohol, miscellaneous glassware of various sizes, and used and unused boxes of Mr. Coffee brand filters within the home.  DUMF No. 29.  Love associated the items found throughout the home with the clandestine manufacture of methamphetamine.  DUMF No. 30.

In the trunk of Jeffcoat's vehicle, Love and Charmley observed a glass coffee pot containing a purplish liquid solution that they believed to be a combination of red phosphorus, iodine, and hydriodic acid.  DUMF No. 31.  The suspect viscous liquid was similar in appearance to the type of material used in the manufacuer of methamphetamine.  Id.  Love and Charmley

4

also observed attached to the coffee pot a glass condenser tube.  DUMF No. 32.  From Love and

Charmley's training and experience, they believed that Campbell possessed the glass coffee pot

containing a purplish liquid solution with the glass condenser tube for the purpose of

manufacturing methamphetamine.  DUMF No. 33.  Campbell acknowledged his possession and

control of the empty blister packs, the various glassware and the coffee pot with an attached

condenser tube.  DUMF No. 34.

During the execution of the search warrant, Charmley and Love interviewed  Brandi

Burchette.  DUMF No. 35.  During the interview of Brandi Burchette, Charmley showed her

items seized from the Jeffcoat's vehicle and asked her if she recognized any of the items.  DUMF

No. 36.  Love asked the female residents whether they were presently menstruating because

filters were found in the kitchen of the Campbell residence.  Id.  The purpose of Love's inquiry

was to secure a statement from the female residents regarding their menstrual cycles should the

criminal investigation reveal that the filters [were] used in the manufacture of the

methamphetamine.  Id.  Brandi Burchette indicated that she recognized the coffee pot with a

rubber stopper inserted at its top and a bent condensing column protruding from it.  DUMF No.

37.  When shown to Brandi Burchett, the coffee pot had an unknown liquid with dark colored

clumps inside.  DUMF No. 38.  The substance in the coffee pot was later identified as

Ephedrine/Pseudoephedrine, an over-the-counter (OTC) component of methamphetamine.  Id.

The crystalline material extracted from the condensing tube attached to the coffee pot found in

the plaintiffs' vehicle tested positive for methamphetamine.  DUMF No. 39.

At approximately 7:30 p.m., Dan Starkey of Kern County Environmental Health Services

contacted Specialist Michael Driggs ("Driggs") to assist in the identification and disposal of

chemicals and associated debris.  DUMF No. 40.  Pryor and Love met Driggs at the Campbell

home.  DUMF No. 41.  Driggs observed several items that Bakersfield Police Officers had

removed from the home and laid just outside a chain-link fence in the front yard.  Id.  Driggs

observed a coffee pot in the trunk of Jeffcoat's vehicle that was being utilized as a "cooker" to

1  manufacture methamphetamine.  Id.  Driggs ascertained which items of evidence seized at the

2  plaintiffs' residence were contaminated.  DUMF No. 41.  Driggs requested for a State authorized

3  cleanup crew to respond to the Campbell home.  DUMF No. 42.  Mr. Paparero approved the

4  cleanup of the Campbell home and advised Specialist Driggs that Parc Environment Waste

5  Hauling Services of Fresno would be responding to dispose of any contaminated items.  Id.

6  　　　At approximately 8:20 p.m., Crime Lab Specialist Sherrie Hill ("Hill" or "Criminalist

7  Hill") appeared on the scene at the plaintiffs' home.  DUMF No. 43.  Criminalist Hill processed

8  several pieces of glassware found at the plaintiffs' residence for latent prints.  Id.  Hill lifted

9  latent prints from a coffee pot (Item #23), a glass beaker (Item #23), glassware (Item #18), and a

10  glass pipe inside a grey box (Item #2).  Id.  Hill, at Love's direction, took approximately thirty-

11  four (34) photographs of seized items at the Campbell residence.  Id.  Hill completed her work

12  and left the investigation scene at approximately 10:40 p.m. Id.

13  　　　As part of the criminal investigation, that Bakersfield Police Department called out

14  Criminalist Matthew Frieson ("Frieson") of the Kern County Criminalistics Laboratory to assist

15  in the collection of seized items.  DUMF No. 44.  Frieson responded to the scene at 9:05 p.m.

16  DUMF No. 45.  Frieson inventoried numerous items believed to be used for the clandestine

17  manufacture of methamphetamine.  DUMF No. 46.  Campbell admitted his ownership and/or

18  control over the items found at his home and used to support Det. Charmley's probable cause for

19  arrest.  DUMF No. 47.  Frieson left the Campbell home around 10:39 p.m.  DUMF No. 48.

20  　　　As part of his investigation, Frieson tested the liquid sampled from the coffee pot with the

21  attached condensing tube found at the Campbell home.  DUMF No. 49.  According to the lab test

22  result, the liquid that Frieson extracted from the coffee pot tested positive for

23  Ephedrine/Pseudoephedrine, an over-the-counter (OTC) component of methamphetamine.

24  DUMF No. 50.  The crystalline material that Criminalist Frieson extracted from the condensing

25  tube attached to the coffee pot found in the plaintiffs' vehicle tested positive for

26  methamphetamine, a schedule II controlled substance.  DUMF No. 51.  The 66 milligrams of

27

28  　　　　　　　　　　　　　　　　　　　　6

1   pink powder material that Frieson extracted from the round plastic container tested positive for

2   Ephedrine/Pseudoephedrine (OTC) and methamphetamine, a schedule II controlled substance.

3   DUMF No. 52.  Frieson identified numerous other solvents and chemicals used in the clandestine

4   manufacture of methamphetamine.  DUMF No. 53.  From his investigation, Frieson concluded

5   that the "[m]aterials, chemicals, and solvents present a the [plaintiffs' residence and vehicle] are

6   consistent with clandestine methamphetamine manufacture via the iodine, phosphorus and

7   Ephedrine/Pseudoephedrine reduction route."  DUMF No. 54.

8          At approximately 10:05 p.m., Robert Lassotovitch of Parc Environmental notified

9   Specialist Driggs that his estimated time of arrival would be approximately 2-3 hours.  DUMF

10  No. 55.  Mr. Lassotovitch arrived at that the Campbell home at approximately 12:40 a.m., on

11  April 21, 2000.  Id.  Mr. Lassovitch, Driggs and Love left the Campbell home located at 5401 ½

12  Rosewood Avenue, Bakersfield, California at approximately 2:00 a.m., April 21, 2000.  DUMF

13  No. 56.  Based on the evidence obtained during the surveillance and at the Campbell home, Det.

14  Charmley arrested Campbell pursuant to Health and Safety Code section 11379.6 (manufacturing

15  of methamphetamine) and 11379 (transportation of methamphetamine).  DUMF No. 57.

16         The Kern County District Attorney's Office independently decided to prosecute Campbell

17  for allegedly manufacturing methamphetamine.  DUMF No. 58.  The officers involved in the

18  subject search and arrest did not influence, control, advise or otherwise direct the prosecution of

19  Campbell.  Id.  On April 4, 2001, the state court sentenced Cambpell to three years in prison.

20  DUMF No. 59.  Campbell's criminal conviction was subsequently reversed on appeal by the

21  appellate court's application of the exclusionary rule.  DUMF No. 60.  According to the case

22  *People v. CAMPBELL*, 2003 Cal. App. Unpub. LEXIS 3967 (2003), the Fifth District Court of

23  Appeals stated that the, ". . . suppression of the evidence is the appropriate remedy and will serve

24  the salutary purpose of the judicially created rule calling for the exclusion of evidence obtained in

25  violation of the [Campbell's] Fourth Amendment right to be free from unreasonable searches."

26  DUMF No. 75.  The Fifth District Court Appeals therefore held that, "[t]he exclusion of the

27

28                                          7

1   evidence obtained pursuant to the execution of the search warrant renders [Campbell's]

2   convictions unsustainable and reversal is required." Id.

3       Det. Charmley's duties two years before the subject search included the enforcement of

4   various narcotic and dangerous drug laws of the State of California.  DUMF No. 61.  As part of

5   these duties, Charmley became familiar with the various methods used to manufacture

6   methamphetamine.  DUMF No. 62.  Charmley's knowledge concerning methamphetamine

7   included the basic chemistry, formulas or recipes, ingredients, cooking time, equipment and

8   methods used in the clandestine manufacturing of methamphetamine.  DUMF No. 63.  Charmley

9   received his formal education regarding the clandestine manufacture of methamphetamine by the

10  Bakersfield Police Department, California Narcotic Officers Association, Bureau of Narcotics

11  Enforcement, Advanced Training Center and the California Department of Justice.  DUMF No.

12  64.  Charmley's field experience provided his informal education concerning the clandestine

13  manufacture of methamphetamine.  DUMF No. 65.  At the time of the subject search, Charmley

14  had participated in innumerable arrests of persons for the manufacture and transportation of

15  methamphetamine.  DUMF No. 66.

16      The officers executing the search warrant at the Campbell home did not recklessly,

17  intentionally, or deliberately act to interfere or, otherwise deprive Campbell, Anthony Campbell,

18  Jr., Nolan Campbell and/or Margaret Campbell of their right to familial relations.  DUMF No.

19  67.  The officers executing the search warrant at the Campbell home neither entered into an

20  agreement nor acted in concert to violate Campbell, Margaret Campbell, Nolan Campbell or

21  Anthony Campbell, Jr., or Jeffcoat's constitutional rights.  DUMF No. 68.  Carvel, Pryor and

22  Love reasonably relied on the search warrant signed by Judge Staley when they participated in

23  the search of the Campbell home.[2]  DUMF No. 74.

24      Charmley, Pryor, Carvel and/or Love did not direct, control, or otherwise influence the

25

26      [2]This DUMF states that the officers reasonably relied on the "valid warrant."  For the reasons that follow,
    the Court cannot hold that the warrant was valid.  Plaintiffs, however, have presented no evidence that the reliance
27  on the warrant by these officers was unreasonable.

1   Kern County District Attorney's Office decision to prosecute Anthony Campbell.  DUMF No.

2   69.  Francis Joy Lane prosecuted Campbell without any undue influence, direction and/or control

3   by Charmley, Carvel, Pryor and/or Love.  DUMF No. 76.  Charmley, Pryor, Carvel and/or Love

4   were merely witnesses in the prosecution of Campbell.  Charmley, Pryor, Carvel and/or Love did

5   not decide trial strategy or use the legal process for an unlawful purpose.  DUMF No. 70.

6        Prior to the search of the Campbell home, Pryor, Carvel and Love did not personally

7   know Campbell, Anthony Campbell, Jr., Nolan Campbell, Margaret Campbell and/or Jeffcoat.

8   DUMF No. 71.  Charmley similarly did know the above named individuals except for Nolan

9   Campbell.  Id.  Despite his acquaintance with Nolan Campbell, Charmley did not know that

10  Nolan Campbell was related to Campbell, Anthony Campbell, Jr., or Margaret Campbell.  Id.  At

11  the time of the subject search, Carvel, Charmley, Pryor, and Love had maintained their required

12  certifications to be peace office in the State of California.  DUMF No. 77.  In so doing, they

13  underwent, at a minimum, 24 hours of training every two years. Id.  Additionally, the Bakersfield

14  Police Department provides its officers three (3) business days per year to attend the training of

15  their choice.  Id.

16       On April 20, 2000, Chief of Police Eric Matlock did not have actual or constructive

17  knowledge of Charmley's procurement of the search warrant or the search of the Campbell

18  residence.  DUMF No. 78.

19       *Defendants's Motion*

20       Defendants argue that the above facts entitle them to summary judgment.  Defendants

21  argue that they are entitled to summary judgment on all of the following claims for the following

22  reasons: (1) First Cause of Action (unreasonable search) because the search was pursuant to a

23  warrant that was based on probable cause, was carried out in a reasonable manner, any injury

24  suffered by Jeffcoat was de minimis, and the officers relied on the warrant and are entitled to

25  qualified immunity; (2) Second Cause of Action (false arrest) because probable cause existed for

26  the arrest; (3) Third Cause of Action (malicious prosecution) because, *inter alia*, there was no

27

28                                                9

favorable termination and the prosecutor exercised independent judgment; (4) Fourth Cause of

Action (abuse of process) because the defendants did not participate in the prosecution of

Campbell; (5) Fifth Cause of Action (interference with familial relationship claim) because there

is no evidence that Defendants acted recklessly or with deliberate indifference and Defendants

were not responsible for the decision to prosecute; (6) Sixth Cause of Action (conspiracy)

because no conspiracy or agreement to violate Campbell's rights existed; (7) Seventh Cause of

Action (*Monell* claim) because the evidence shows that there is no flawed custom or policy and

that Bakersfield hired qualified individuals; (8) Eighth Cause of Action (*City of Canton* liability)

because Bakersfield adequately trained its officers, was not on notice that further training was

necessary, and was not deliberately indifferent; and (9) Ninth Cause of Action (*Larez* liability)

because Chief Matlock did not participate or know or should have known about the search,

because Sgt. Pryor reasonably relied on a signed warrant obtained by Charmley, and because

there was no violation of Plaintiffs's rights, Charmley cannot be liable since his subordinates

acted pursuant to a presumably valid warrant.

### *Plaintiffs's Opposition*

Campbell and Jeffcoat have filed identical oppositions, submitted numerous exhibits, and

the declarations of Ronda Rogers and Margaret Campbell.  Plaintiffs's opposition reads that

Defendants are not entitled to summary judgment because:

> . . . probable cause never existed to support the procurement of the search warrant
> of which said warrant was not constitutionally sound; that the search of plaintiffs'
> home was not reasonably performed; that the defendants did not have probable
> cause to arrest Anthony J. Campbell; and detain Sandra Jeffcoat, with deliberate
> indifference under cruel conditions; that the defendants did maliciously prosecute
> Anthony J. Campbell for an unlawful purpose; that the defendants did deny
> plaintiffs' of their familial relations; that the defendants are not entitled to
> immunity; and are not entitled to qualified immunity; that sufficient evidence
> exists to support municipal liability claims; and that Chief Matlock failed to take
> disciplinary action against his departments police officers blatant and obvious
> "*unlawful police conduct*" resulting in violations of the Constitution according to
> proof.  See: ***People v. Campbell, F037937 2003 Cal. App. Unpub. LEXIS 3967***;
> attached hereto.  Whereby, defendants are not entitled to summary judgment
> pursuant the standards as set forth in Federal Rules of Civil Procedure, Rule 56.

Plaintiffs Opposition at p. 2 (emphasis in original).  Plaintiffs have not specifically directed the

Court to any of the evidence or exhibits submitted and do not support the assertions made in the above opposition with citation to any evidence or authority, other than to *People v. Campbell*.[3]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan, 252 F.Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact

.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

---

[3]Plaintiffs have filed a motion for the Court to take judicial notice of what amounts to the verbatim argument made in their opposition as quoted above.  Defendants have filed a lengthy objection.  The bare legal conclusions that Plaintiffs seek to have this Court judicially notice are not the matters that a court may judicially notice.  See Fed. R. Evid. 201.  Plaintiffs's motion for judicial notice is denied.

an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001). However, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

parties' differing versions of the truth at trial." <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>Hopper v. City of Pasco</u>, 248 F.3d 1067, 1087 (9th Cir. 2001). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587; <u>Mende v. Dun & Bradstreet, Inc.</u>, 650 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. <u>See</u> Rule 56(c); <u>Fortyune</u>, 364 F.3d at 1079-80. The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. <u>See</u> <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. <u>See</u> <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita</u>, 475 U.S. at 587; <u>Stegall v. Citadel Broad, Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>See</u> <u>Mayweathers v. Terhune</u>, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); <u>UMG Recordings, Inc. v. Sinnott</u>, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d 15, 23 (1st Cir. 2002); <u>see also</u> <u>Bryant v. Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002); <u>Angel v. Seattle-First Nat'l Bank</u>, 653 F.2d 1293, 1299 (9th Cir. 1981).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

A pro se party (who is not incarcerated) is held to the same standard in responding to a motion for summary judgment as a represented party.  Jacobsen v. Filler, 790 F.2d 1362, 1364-66 (9th Cir.1986).

*Qualified Immunity*

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made," and that it is "often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces."  Estate of Ford v. Rameriz-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  Thus, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  KRL v. Moore, 384 F.3d 1105, 1116 (9th Cir. 2004); Estate of Ford, 301 F.3d at 1049.

The first step in evaluating qualified immunity is to determine whether the plaintiff has shown conduct that violates his constitutional rights.  See Galvan v. Hay, 374 F.3d 739, 745 (9th Cir. 2004); Butler v. Elle, 281 F.3d 1014, 1021 (9th Cir. 2002).  That is, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001); Johnson v. County of Los Angeles, 340 F.3d 787, 792 (9th Cir. 2003).  If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Saucier, 533 U.S. at 201; KRL, 384 F.3d at 1115; Johnson, 340 F.3d at 792.  Under the second sequential step, the court determines: "(1) whether the violated right was clearly

14

established, and (2) whether a reasonable public official could have believed that the particular

conduct at issue was lawful."[4] Butler, 281 F.3d at 1021; Act Up!/Portland v. Bagley, 988 F.2d

868, 873 (9th Cir. 1993); see also KRL, 384 F.3d at 1115. The plaintiff bears the burden of

showing that the underlying right was clearly established at the time of the alleged misconduct.

See Devereaux, 218 F.3d at 1051 (9th Cir. 2000); Romero, 931 F.2d at 627. If the plaintiff

shows a clearly established right, the burden then shifts to the officer to prove that his actions

were reasonable, even if they did violate the plaintiff's constitutional rights. See Deveraux, 218

F.3d at 1051; Doe v. Petaluma City School Dist., 54 F.3d 1447, 1450 (9th Cir. 1995).

In order for a right to be clearly established, the "contours of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right."

Anderson v. Creighton, 483 U.S. 635, 640 (1987); Washington v. Lambert, 98 F.3d 1181, 1192

(9th Cir. 1996). "This is not to say that an official action is protected by qualified immunity

unless the very action in question has previously been held unlawful, but it is to say that in light

of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640; Devereaux

v. Perez, 218 F.3d 1045, 1052 (9th Cir. 2000). The inquiry into whether the right is 'clearly

established' must "focus on the right not in a general, abstract sense, but rather in a practical,

'particularized' sense." Moran v. Washington, 147 F.3d 839, 845 (9th Cir. 1998). Accordingly,

"broad rights must be particularized before they are subjected to the clearly established test." Id.

With respect to reasonable belief, "the relevant, dispositive inquiry . . . is whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." Saucier, 533 U.S. at 202; KRL, 384 F.3d at 1115. The inquiry focuses on whether

"a 'reasonable officer' could have had the belief [that his conduct was lawful], not whether the

individual officer involved actually thought his conduct was lawful." Washington, 98 F.3d at

---

[4]The Ninth Circuit has characterized the qualified immunity analysis as both a two-part and three-part inquiry, but the particular characterization is not important. See Schwenk v. Hartford, 204 F.3d 1187, 1196 n.5 (9th Cir. 2000). The consistent approach of the Ninth Circuit "has always been to 'determine whether a reasonable officer could have believed lawful the particular conduct at issue." Id. (citation omitted).

1192; see also Schwenk v. Hartford, 204 F.3d 1187, 1196 n.5 (9th Cir. 2000) (noting that the

consistent approach to qualified immunity has always been to "determine whether a reasonable

officer could have believed lawful the particular conduct at issue."). In sum, "regardless of

whether the constitutional violation occurred, the officer should prevail if the right asserted by

the plaintiff was not 'clearly established' or the officer could have reasonably believed that his

particular conduct was lawful." Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991); see

also Moran, 147 F.3d at 844.

        *Search Warrants*

        Under the Warrants Clause of the Fourth Amendment, "no warrants shall issue, but upon

probable cause, supported by Oath or affirmation, and particularly describing the place to be

searched and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause"

means "'fair probability,' not certainty or even a preponderance of the evidence." United States

v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006). A magistrate is only required to answer the

commonsense, practical question whether, under the totality of the circumstances, there is

probable cause to believe that contraband or evidence is located in a particular place before

issuing a search warrant. Id. "The facts presented [to the magistrate] must be sufficient to justify

a conclusion that the property which is the object of the search is probably on the premises to be

searched at the time the warrant is issued." Greenstreet v. County of San Bernardino, 41 F.3d

1306, 1309 (9th Cir. 1994). Given the pressures confronting magistrates, police officers who

apply for warrants are required to minimize the danger of a warrant issuing without probable

cause by "exercising reasonable professional judgment." Malley v. Briggs, 475 U.S. 335, 345-46

(1986). If a warrant is "ultimately found to be unsupported by probable cause or lacking in

particularity, searches conducted pursuant to the warrant may be valid under the good-faith

exception set forth in *United States v. Leon*, 468 U.S. 897, 926 (1984)." Jones v. Wilhelm, 425

F.3d 455, 464 (7th Cir. 2005). It is "necessary that police officers be immune when they

reasonably believe that probable cause existed, even though it is subsequently concluded that it

did not, because they cannot be expected to predict what federal judges frequently have

considerable difficulty in deciding and about which they frequently differ among themselves."

Smiddy v. Varney, 665 F.2d 261, 266 (9th Cir. 1981).

The *Leon* standard for good faith reliance on a warrant is the same standard used to

determine reasonableness for qualified immunity where a warrant is found to be invalid.  Malley,

475 U.S. at 344-45.  "An officer is not entitled to rely on a warrant which is 'so facially

overbroad as to preclude reasonable reliance by the executing officers.'"  Marks v. Clarke, 102

F.3d 1012, 1028 (9th Cir. 1996).  Further, where a warrant application is so lacking in indicia of

probable cause as to render official belief in its existence unreasonable," immunity will be lost.

Mills v. Graves, 930 F.2d 729, 731 (9th Cir. 1991); see Malley, 475 U.S. at 344-45.  As the

Supreme Court has explained, the appropriate question is:

> whether a reasonably well-trained officer in [defendant's] position would have
> known that his affidavit failed to establish probable cause and that he should not
> have applied for the warrant.  If such was the case, the officer's application for a
> warrant was not objectively reasonable, because it created the unnecessary danger
> of an unlawful arrest.

Malley, 475 U.S. at 345.[5]

The burden is on the officers to prove that their reliance on the warrant was objectively

reasonable.  Marks, 102 F.3d at 1028.  However, what is reasonable for a particular officer

depends on the officer's particular role in the search.  Ramirez v. Butte-Silver Bow County, 298

F.3d 1022, 1027 (9th Cir. 2002).  As the Ninth Circuit has explained:

> Because searches often 'require[]cooperation and division of labor,' Guerra v.
> Sutton, 783 F.2d 1371, 1375 (9th Cir. 1986), officers' roles can vary widely.
> Typically, only one or a few officers plan and lead a search, but more - perhaps
> many more - help execute it. The officers who lead the team that executes a
> warrant are responsible for ensuring that they have lawful authority for their
> actions. A key aspect of this responsibility is making sure that they have a proper
> warrant that in fact authorizes the search and seizure they are about to conduct.
> The leaders of the expedition may not simply assume that the warrant authorizes
> the search and seizure. Rather, they must actually read the warrant and satisfy

---

[5]Although *Malley* involved an arrest warrant, "the distinction between a search warrant and an arrest warrant would not make a difference in the degree of immunity accorded the officer who applied for the warrant." Malley, 475 U.S. at 344 n.6.

themselves that they understand its scope and limitations, and that it is not defective in some obvious way. See United States v. Leon, 468 U.S. 897, 922-23, (1984) (search pursuant to a warrant is invalid if no reasonable officer could have believed the warrant was valid). The leaders of the search team must also make sure that a copy of the warrant is available to give to the person whose property is being searched at the commencement of the search, and that such copy has no missing pages or other obvious defects.

Line officers, on the other hand, are required to do much less. They do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid. Guerra, 783 F.2d at 1375; Marks, 102 F.3d at 1029-30 . So long as they 'make inquiry as to the nature and scope of [the] warrant,' Guerra, 783 F.2d at 1375, their reliance on leaders' representations about it is reasonable. Id.; Marks, 102 F.3d at 1029-30 . The line officers here acted reasonably: They were told that a warrant had been obtained and learned through an advance briefing what items could be seized. Guerra, 783 F.2d at 1375; Marks, 102 F.3d at 1030.

Ramirez, 298 F.3d at 1027-28.  For purposes of reasonable reliance, the warrant should clearly described with particularity the place to be searched and the objects to be seized, but there is "no further requirement that the warrant articulate the foundation for the finding of probable cause." Mills, 930 F.2d at 732.

### *Fourteenth Amendment Right To Familial Relationships*

"It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004); Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001).  The constitutional interest in familial companionship and society protects against deprivations that are a result of "unwarranted state interference." See Lee, 250 F.3d at 685; Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987);[6] Crowe v. County of San Diego, 359 F. Supp. 2d 994, 1039 (S.D. Cal. 2005).  Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship. See Gausvik v. Perez, 392 F.3d 1006, 1008

---

[6]Overruled on other grounds by Hodgers-Durgin v. De La Vina, 199 F.3d 1037 (9th Cir. 1999).

(9th Cir. 2004); <u>Schaefer v. Goch</u>, 153 F.3d 793, 799 (7th Cir. 1998); <u>Crowe</u>, 359 F.Supp.2d at 1039.  To recover for an unwarranted interference with familial relationship, a plaintiff must show that the defendant acted with deliberate indifference to plaintiff's right to familial association.  <u>See</u> <u>Byrd v. Guess</u>, 137 F.3d 1126, 1134 (9th Cir. 1998); <u>Smoot v. City of Placentia</u>, 950 F.Supp. 282, 283-84 (C.D. Cal. 1997).

**1.   CLAIMS AGAINST CHARMLEY**

   **a.      The Search Warrant**

   Detective Charmley was the case agent for the search of Plaintiffs's residence, <u>see</u> DUMF No. 16, the officer who obtained the search warrant, <u>see</u> DUMF Nos. 12-14, the officer who informed the other officers who were to conduct the search that he had obtained a search warrant for Campbell's home, vehicle, and person, <u>see</u> DUMF No. 17, the officer who conducted the operation briefing before execution of the search warrant in order to advise the participating officers of the purpose and breadth of the search, <u>see</u> DUMF No. 18, and the officer who informed Plaintiffs that he had a warrant and was looking for evidence of methamphetamine production.  <u>See</u> DUMF No. 24.  There is no indication that any other officer provided information to the magistrate in the application process.

   Since Charmley was successful in obtaining the search warrant, and since the search was conducted pursuant to the warrant, the Court must determine whether the warrant was supported by probable cause.  If the warrant was not supported by probable cause, then the search violated the Fourth Amendment.  The Court must then determine whether Charmley could reasonably believe that the warrant was supported by probable cause.

   Defendants have produced the single page search warrant.  <u>See</u> Exhibit B of Charmley Declaration.  Defendants have not produced the affidavit that was submitted by Charmley as part of the warrant application process and that was incorporated into the search warrant by

reference.[7]  See id.  Defendants have produced, and Plaintiffs rely on/reference in their

oppositions, the Court of Appeals's unpublished opinion that reversed Campbell's conviction.

The California Fifth District Court of Appeals ("Fifth DCA") reversed Campbell's conviction

through application of the exclusionary rule.  In particular, the Fifth DCA held that the search

warrant was not based on probable cause and a reasonable officer would know that probable

cause was so lacking that application for the warrant was inappropriate.  See People v. Campbell,

2003 Cal.App.Unpub. LEXIS 3967 at *26-*27, *29-*30. (2003).  The Fifth DCA indicated that

there were sealed affidavits and/or portions of affidavits that were submitted to Judge Staley as

part of the warrant application.  Id. at .  The Fifth DCA, however, quoted the unsealed portion of

Charmley's affidavit:

> On 4/20/00, at approximately 1415 hours, detectives from the Bakersfield Police
> Department Vice/Narcotics Unit began conducting a moving surveillance on a
> white male adult with a white T-shirt, ball hat, approximately 6'0" in height, 225
> to 250 pounds, driving a blue, 1995 Dodge Intrepid, California license #
> 3MFR826. This vehicle was surveilled to Food Maxx at the southwest corner of
> Fairfax Road and Niles Street. This subject exited his vehicle with an object,
> white in appearance, which he placed into the trunk, where he then walked into
> the store. Detective S. Carvel of the Bakersfield Police Department
> Vice/Narcotics Unit went into the store with this unidentified white male and
> observed him placing several brown bottles into a plastic bag while at the register.
> Detective Carvel believed these bottles were bottles of hydrogen peroxide. This
> unidentified white male exited the store with a bag which he placed into the trunk
> of his vehicle. This vehicle was then surveilled to a residence immediately south
> of 5401 Rosewood and immediately to the west of 908 Brentwood. A surveillance
> was conducted at this residence, and this unidentified white male was seen to
> enter and exit through the gate and to his vehicle several different times. I later
> spoke with Detective Carvel who told me that he had made contact with the
> manager of the Food Maxx at Niles and Fairfax who provided him with a receipt
> for the purchase made by this unidentified white male subject which were for four
> bottles of hydrogen peroxide. I know from my past training and experience that
> hydrogen peroxide, along with muriatic acid and 7% tincture of iodine are used to
> create iodine crystals which are used as a precursor, along with ephedrine and a
> strong acid, to manufacture methamphetamine. I have investigated numerous
> small scale methamphetamine labs that have both been active and inactive, and
> have observed 7% tincture of iodine, muriatic acid, and hydrogen peroxide at
> these locations. I have also spoken with subjects that I have arrested for
> manufacturing methamphetamine who have outlined to me these items listed
> above that are used to manufacture methamphetamine. [P] Based on the facts

[7]Plaintiffs have submitted as "Exhibit B" an unsigned, undated document that purports to be Charmley's
probable cause statement.  Given that the document is unsigned and undated, the Court will reference and rely on the
probable cause statement as described by the California Court of Appeals.

1  contained in this Statement of Probable Cause, and my training and experience, I
2  believe the previously described evidence is indicative of the manufacturing of
   methamphetamine.

3  Id. at *22-*24.  The Fifth DCA further noted that, "The remaining facts, upon which the warrant

4  was issued, are contained within the sealed affidavit."  Campbell, 2003 Cal.App.Unpub. LEXIS

5  3967 at *24-*25.  The Fifth DCA concluded that the warrant was not supported by probable

6  cause.  Id. at *26-*27.

7      The above unsealed portion of the affidavit is consistent with the undisputed facts

8  submitted in this motion.  See DUMF Nos. 1-15.  Additionally, it seems relatively clear that the

9  confidential informant submitted a declaration or that Charmley filed a sealed affidavit regarding

10  the confidential informant.  Given the undisputed facts submitted by Defendants, the Court

11  believes that the magistrate was likely informed that the confidential informant had proven

12  reliable in the past, that Campbell had purchased some quantity of 7% tincture of iodine, and the

13  informant did not recognize Campbell as a regular customer or as someone known to have a

14  large quantity of animals.  See DUMF Nos. 1-4.

15      Probable cause is a common sense determination and is less than beyond reasonable

16  doubt, a preponderance of the evidence, and a prima facie case:  it is simply that there is a fair

17  probability that a crime has been committed or contraband will be found.  See Gourde, 440 F.3d

18  at 1069.  The basis for the warrant in this case is the purchase of a total of five items at two

19  locations: approximately one litre of 7% iodine tincture at a farm supply store and 4 bottles of

20  unknown size of hydrogen peroxide at a grocery store.  The affidavit stated that these ingredients,

21  along with muriac acid, can be used in the production of methamphetamine.  There is no

22  indication that Plaintiff also purchased muriac acid.  Furthermore, there is no evidence

23  concerning what quantities of 7% tincture of iodine and hydrogen peroxide are necessary to

24  produce methamphetamine and how that amount, whatever it may be, compares with the

25  quantities of iodine and hydrogen peroxide purchased by Campbell.  There is also no indication

26  whether Campbell had any animals on his property that may have required the iodine tincture,

27  nor is there any physical description of Campbell's residence.  Without more, the Court cannot

28

21

say that probable cause actually existed since purchasing iodine tincture and hydrogen peroxide

seems at least equally consistent with life in the country and/or with livestock as with

methamphetamine production.  Although not bound by the Fifth DCA's analysis for immunity

purposes, the Court agrees that the information obtained by Charmley may have warranted

further investigation, but did not create probable cause.  Campbell, 2003 Cal.App.Unpub. LEXIS

3967 at *26-*27.  Based on the evidence submitted, the Court cannot conclude as a matter of law

that the warrant was supported by probable cause.

Since the evidence presented indicates that the warrant was not based on probable cause,

the Court must determine whether a reasonable officer in Charmley's position would have

realized that probable cause was so lacking as to make application for the warrant unreasonable.

See Malley, 483 U.S. at 345; Marks, 102 F.3d at 1026 n.31.

In the state law criminal proceedings, the Fifth DCA also concluded that Leon's good

faith reliance exception did not apply.  Campbell relies on the Fifth DCA's opinion/conclusion as

the only cited authority for resisting summary judgment.  The Fifth DCA reasoned:

> [Campbell's] case falls within the third basis for exclusion under Leon.[8] "If a
> well-trained officer should reasonably have known that the affidavit failed to
> establish probable cause (and hence that he should not have sought a warrant),
> exclusion is required under the third situation described in Leon, and a court may
> not rely on the fact that a warrant was issued in assessing objective reasonableness
> of the officer's conduct in seeking the warrant."
>
> Detective Mark Charmley, a veteran of 17 years, including at least two years
> working in narcotics, could not have reasonably believed the bare bones affidavits
> he presented to Judge Staley, provided probable cause to suspect that evidence of
> the illegal manufacturing of methamphetamine would be located at [Campbell's]
> property or in the vehicles under his control.
>
> "It is true that in an ideal system an unreasonable request for a warrant would be
> harmless, because no judge would approve it.  But ours is not an ideal system, and
> it is possible that a magistrate, working under docket pressures, will fail to
> perform as a magistrate should. We find it reasonable to require the officer

---

[8]Under Leon, evidence obtained pursuant to a warrant will be suppressed if:  (1) the magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false but for a reckless disregard for the truth; (2) where the magistrate wholly abandons his judicial role; (3) where the affidavit itself was "so lacking in indicia of probable cause so as to render official belief in its existence unreasonable; or (4) where the warrant is so facially deficient that officers cannot reasonably presume it to be valid.  United States v. Leon, 468 U.S. 897, 923 (1984).

applying for the warrant to minimize this danger by exercising reasonable professional judgment." We conclude Detective Charmley did not exercise reasonable professional judgment in requesting the issuance of the search warrant in this particular case.

Consequently, suppression of the evidence is the appropriate remedy and will serve the salutary purpose of the judicially created rule calling for the exclusion of evidence obtained in violation of appellant's Fourth Amendment right to be free from unreasonable searches.

Id. at *28-*30.

Again, the analysis of the Fifth DCA is not binding on this Court for purposes of immunity. Nevertheless, the Court finds the Fifth DCA's opinion to be persuasive, largely because the analysis for good faith under *Leon* is the same as the good faith analysis for qualified immunity for searches pursuant to a warrant that is not supported by probable cause. See Malley, 483 U.S. at 344-45. Qualified immunity based on good faith reliance on a search warrant is appropriate unless a reasonable officers in Charmley's position would have recognized that probable cause was so lacking that it was improper to go to a magistrate. The affidavit in this case relies on an informant who did not recognize Campbell as a customer, the purchase of some unknown quantity of 7% iodine tincture, and the purchase of four bottles (of unknown size) of hydrogen peroxide. The affidavit does not discuss the purchase of other products, such as muriac acid or quantities of cold medicine, there is no discussion regarding Campbell's property, such as the absence of livestock, and there is no discussion regarding the significance of the quantities of hydrogen peroxide and 7% iodine tincture purchased by Defendant in relation to the quantities of these chemicals associated with the production of methamphetamine. At the end of the day, this case boils down to the purchase of two products that are generally used for medical purposes. This is simply an insufficient basis for probable cause. Viewing the evidence in the light most favorable to Plaintiffs, the Court cannot say as a matter of law that a reasonable officer in Charmley's position could have reasonably believed that there was sufficient evidence to establish probable cause such that approaching the magistrate was appropriate. See Malley, 475 U.S. at 345. Charmley's request for qualified immunity and/or summary judgment for obtaining the search warrant and searching Plaintiffs's residence and vehicle is denied.

23

### b.      Reasonableness Of The Execution Of The Search Warrant

Plaintiffs indicate that the search lasted between 8 and 10 hours, and Defendants contend that the search lasted approximately 9 hours.  See Plaintiffs's Complaint at ¶¶ 36, 49; Defendants's Motion for Summary Judgment at 9:14.  Plaintiffs do not expressly allege that the search was unreasonable due to its duration under this claim.  Paragraph 36 of the complaint indicates that the search began on or about 4:00 p.m. and did not conclude until 2:00 a.m.  The thrust of Plaintiffs's First Cause of Action, for unreasonable search, is that Defendants:   did not have probable cause to either obtain the warrant or actually search the home, used abusive and inappropriate language, improperly seized items and failed to list those items in their reports, and rearranged and planted evidence.[9]  See Plaintiffs's Complaint at ¶¶ 33-45.  In the conspiracy claim (Plaintiffs's Third Cause of Action), Plaintiffs do allege that the search was unreasonably prolonged.  Irrespective of whether Plaintiffs are challenging the duration of the search, Defendants have nevertheless raised the issue and argue that the duration of the search was reasonable.  Plaintiffs have failed to address the duration of the search in their opposition.

The evidence indicates that Plaintiffs's residence is approximately 1,250 square feet.  The warrant authorized a search of the residence, Plaintiffs's vehicle, and Campbell's person and, in a nutshell, authorized the officers to search for methamphetamine and paraphernalia associated with the sale and production of methamphetamine.  As the search progressed and evidence was found, such as chemicals and at least trace amounts of methamphetamine, additional personnel were contacted and responded to the residence, including additional criminalists, an environmental health specialist, and an environmental waste specialist.  See DUMF Nos. 26-56.  The additional criminalists were called to analyze chemicals and materials found, see DUMF No. 40-42 & 45-54, to take fingerprints from various glassware and take photographs, see DUMF No. 43, and to dispose of contaminated materials.  See DUMF No. 42, 55.  Further, the officers had to wait approximately two hours for hazardous waste disposal personnel to arrive.  See DUMF

---

[9]The Court will address the abusive language and rearranging/planting evidence claims at a different point in the opinion.

No. 55.  Additionally, Love declares, "In my experience as a Certified Lab Specialist, the duration of the search at the Campbell home was reasonable considering its nature and the requisite response to the contaminated items found at the residence."  Love Declaration at ¶ 21. Finally, there is no evidence or argument that suggests that the search was unreasonably or unduly prolonged by the officers in order to gain more information.  Cf. Michigan v. Summers, 452 U.S. 692, 702 (1981) (noting detention during a search was not unduly prolonged for the purpose of obtaining information since the information sought will normally be obtained through the search).  Plaintiffs have offered no contrary evidence or specific arguments that the duration of the search was unreasonable.  To the extent that Plaintiffs contend that the search was unreasonable due to its duration, summary judgment in favor of all Defendants is appropriate.

### c.    False Arrest

#### (1)    Probable Cause

"An arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983."  Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1988). A warrantless arrest does not violate the Fourth Amendment, however, if the officers had probable cause to believe the individual had committed or was about to commit a crime.  See Picray v Sealock, 138 F.3d 767, 770 (9th Cir. 1998).  Probable cause is determined at the time the arrest is made.  See Allen v. City of Portland, 73 F.3d 232, 236 (9th Cir. 1995).  Probable cause is an objective inquiry and exists when, under the totality of the circumstances, the agents know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense.  See Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004); Allen, 73 F.3d at 237.  As an objective inquiry, the arresting officer's subjective state of mind, except for the facts known by the officer, is irrelevant to the existence of probable cause.  See Devenpeck v. Alford, 125 S.Ct. 588, 593-94 (2004).

Here, the cumulative effect of the evidence discovered at Campbell's residence is sufficient to establish probable cause that Campbell was engaged in the production of methamphetamine.  During the search of the residence, officers discovered materials that were

consistent with the production of methamphetamine, such as over the counter medication, iodine, peroxide, filters, glassware of various sizes (including a pipe and glass beaker), and tubing.  See DUMF Nos. 26-30, 54; Love Declaration at ¶ 18(I)-(xxvii).  During the search of the vehicle, officers discovered a coffee pot that had a condenser tube attached to it and that contained a purplish liquid.  See DUMF No. 31-32.  Campbell acknowledged ownership of all of these materials, including the coffee pot.  See DUMF No. 34.  Testing of the purplish liquid in the coffee pot revealed the presence of psuedoephedrine, a component of methamphetamine.  See DUMF Nos. 38, 50.  Moreover, crystaline material found in the condenser tube that was attached to the coffee pot tested positive for methamphetamine.  See DUMF Nos. 39, 51-52.  Based on the experience of Love, Charmley, and Criminalist Frieson, the materials discovered were consistent with clandestine methamphetamine manufacture.  See DUMF Nos. 30, 33, 54.  Given the totality of these circumstances, especially the discovery of a coffee pot with a condenser tube that contained a purplish liquid and that tested positive for methamphetamine and psuedoephedrine, Charmley had probable cause to believe that Campbell was manufacturing methamphetamine. Where probable cause exists to make an arrest, there is no claim for false arrest.  See Cabrera v. City of Huntington Beach, 159 F.3d 374, 380 (9th Cir. 1998) (holding that to prevail on a false arrest claim under 42 U.S.C. § 1983 a plaintiff must demonstrate the absence of probable cause). Accordingly, summary judgment is appropriate on this claim.

**(2)   Damages**

That probable cause existed for the arrest does not necessarily cut off damages from the point of arrest.  The Court has determined that a trier of fact could find a violation of the Constitution based on the search of Plaintiffs's residence and vehicle.  "A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations."  Borunda v. Richmond, 885 F.2d 1384, 1389 (9th Cir. 1989).  "Section 1983 imposes a causation requirement similar to that of ordinary tort law."  Maldonado Santiago v. Velazquez Garcia, 821 F.3d 822, 831 (1st Cir. 1987); see also Reich v. Minnicus, 886 F.Supp.

674, 684-85 (S.D. Ind. 1993). In discussing causation under § 1983 and the exclusionary rule

utilized in criminal cases, the *Reich* court persuasively explained:

> When a plaintiff seeks to recover damages for injuries suffered during successive steps of state action -- e.g., search, arrest, interrogation, detention, and trial -- each stage of conduct must be separately judged by the constitutional standard applicable to the particular right violated, whether Fourth, Fifth, or Fourteenth Amendment. The exclusionary remedy does not operate to characterize all subsequent conduct "unconstitutional" simply because a previous step was defective. However, a plaintiff who suffers a constitutional deprivation early-on may, under § 1983, recover for his later injuries, even during later constitutional stages in the process, if the injuries are reasonably foreseeable consequences of the earlier deprivation of rights.

Reich, 886 F.Supp. at 685.

> With respect to liability for unconstitutional searches, the *Reich* court opined:

> In the not uncommon scenario where different government officials are independently responsible for different stages of the criminal process, a finding that the entire chain of events was tainted because of an earlier defective link raises questions of the actors' liability which are more properly analyzed under the rubric of proximate causation of damages rather than constitutionality of conduct. Would defendant officers who were responsible for a plaintiff's arrest, post-arrest interrogation, and detention, and who performed those functions constitutionally and in good faith, be liable for relative portions of the plaintiff's damages if it were later determined that other officers at the start of the chain, who had no further responsibility over the plaintiff, conducted an initial illegal search? Obviously, only the actual tortfeasors should be held responsible. Rather than analyzing such scenarios under an awkward "constructive unconstitutionality" approach, governed by taint-attenuation rules which were not developed for such applications, courts would do better to simply determine the unconstitutional conduct, identify the tortfeasors, and apply the extant rules of proximate cause to determine the extent of damages.

Id. at 685 n.10. In other words, a plaintiff may recover damages for an arrest to the extent that

the arrest was proximately caused by an unlawful search. Howard v. City of Grand Rapids, 2002

U.S. Dist. LEXIS 17390 at *23-*24 (W.D. Mich. 2002); Carter v. Georgevich, 78 F.Supp.2d 332,

336 (D.N.J. 2000);[10] Reich, 886 F.Supp. at 684-85 & n.10; cf. Borunda, 885 F.2d at 1389.

"[T]he chain of causation set in motion by the initial act of misconduct of one actor can

be broken by the acts of a third party. For example, police officers have been held to be insulated

from liability for deprivations of liberty where there are independent, intervening acts of other

---

[10]The Third Circuit declined to adopted the approach taken by *Carter* with respect damages for an illegal search. See Hector v. Watt, 235 F.3d 154, 163 (3d Cir. 2000).

decision-makers in the criminal justice system, such as prosecutors, grand juries, or judges."
Alvarez-Machain v. United States, 331 F.3d 604, 636 (9th Cir. 2003) (en banc).[11]  Thus, the
independent judgment of a prosecutor, grand jury, judge, or jury may break the chain of causation
and prevent damages for a criminal trial (including attorney's fees), conviction, incarceration,
and aggravation of the plaintiff's condition, unless the plaintiff can show that such intervening
acts were the result of deception or undue pressure by a defendant.  See Sloman v. Tadlock, 21
F.3d 1462, 1474 (9th Cir. 1994); Barlow v. Ground, 943 F.2d 1132, 1136 (9th Cir. 1991)
(holding that judgment of a prosecutor may prevent damages if that judgment so independent so
as to "be considered the proximate cause of the subsequent criminal proceedings"); Borunda, 885
F.2d at 1390; Barts v. Joyner, 865 F.2d 1187, 1195 (11th Cir. 1989); Smiddy v. Varney, 665 F.2d
261, 266-67 (9th Cir. 1981).

Here, in connection with their defense of the malicious prosecution claim, Defendants
argue that the prosecutor in this case, Francine Lane, exercised her independent judgment in
deciding to file criminal charges against Campbell.  See DUMF Nos. 58, 76.  In a declaration in
support of summary judgment, Lane declares, "I personally handled the prosecution of Mr.
Campbell.  Based on the reports presented to me, I independently decided to file criminal charges
against Mr. Campbell . . . .  Between January and April, 2001, I tried the criminal action against
[Campbell].  No member of the Bakersfield Police Department attempted to influence, direct or
control my handling of the prosecution of [Campbell].  I managed the prosecution of [Campbell]
at my discretion and that of my superiors."  Lane Declaration at ¶¶ 2-4.  The issue of probable
cause appears to have arisen early in the prosecution of Campbell.  On June 5, 2000, prior to
Campbell's preliminary hearing, Campbell filed a motion to quash the search warrant and
suppress the evidence obtained based in part on the argument that the warrant was unsupported
by probable cause.  See Campbell, 2003 Cal. App. Unpub. LEXIS 3967 at *2 n.1, *12-*14.  The
Kern County Superior Court denied the motion to quash and suppress on June 7, 2000, after a

[11]Reversed on other grounds Sosa v. Alavarez-Machain, 542 U.S. 692 (2004).

hearing.  Id.  Prosecutor Lane was present at the June 7, 2000, hearing.  See Margaret Campbell

Declaration at ¶¶ 7-12.   Further, the motion to suppress was reargued on September 6, 2000, at

which hearing Lane was present, and the Superior Court again denied suppression on September

19, 2000, on the basis that probable cause existed for the search warrant.  See Campbell, 2003

Cal. App. Unpub. LEXIS 3967 at *2 n.1, *17-*18.  On October 25, 2000, a five count

information was filed against Campbell.  Id. at *1.  The evidence indicates that Lane was the

prosecutor handling the case, had reviewed the reports of the case, was aware that there was an

issue concerning probable cause for the search warrant, and exercised her own independent

judgment to prosecute Campbell.  There is no admissible evidence that Lane was unduly

influenced or deceived by any of the Defendants.[12]  See DUMF Nos. 69-70.  Lane's exercise of

independent judgment to pursue the prosecution of Campbell is an intervening cause.  The chain

of causation from the search (April 20, 2000) to the conclusion of the criminal appellate process

in 2003 has been severed by the independent judgment of Lane.[13]  See Alvarez-Machain, 331

F.3d at 636; Sloman, 21 F.3d at 1474; Barlow, 943 F.2d at 1136; Borunda, 885 F.2d at 1390;

Barts, 865 F.2d at 1195; Smiddy, 665 F.2d at 266-67.   Accordingly, from the time Lane

exercised her independent judgment, to prosecute Campbell to the conclusion of the criminal

proceedings against Campbell in 2003, no damages are available to Campbell for the conduct

---

[12]Plaintiffs have submitted the declaration of Margaret Campbell in opposition to summary judgment. Margaret Campbell, in relevant part, indicates that after the preliminary hearing, Charmley moved quickly past her in order to speak to Prosecutor Lane.  Margaret Campbell Declaration at ¶ 12.  After Charmley spoke with Lane, a meeting in the judge's chambers with counsel ensued and resulted in a stipulated lower bond amount ($10,000 from $50,000).  Id. at ¶ 13.  After the proceedings ended and while exiting the court room, Lane commented, "You see who's directing this case don't you?"  Id. at ¶ 14.  The "who" Lane was referring to was Charmley.  Id.

Defendants make multiple objections to Margaret Campbell's declaration, including hearsay.  Lane was the prosecutor in the state court criminal proceedings and is not a party to this lawsuit.  See Lane Declaration at ¶ 1. Lane's purported statement to Margaret Campbell is clearly hearsay.  See Fed. R. Evid. 801.  The Court does not see an exception to the hearsay rule that is applicable.  Since portions of Paragraph 14 of Margaret Campbell's declaration are hearsay, and no exception is apparent, Defendants's hearsay objection is sustained.  Accordingly, Lane's purported statement in Paragraph 14 of Margaret Campbell's declaration will not be considered by the Court.

[13]Given the absence of deception or undue influence, the evidence suggests that the failure of the Superior Court to suppress the evidence is also an act of independent judgment that severs the chain of causation.  See Alvarez-Machain, 331 F.3d at 636 (citing Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999) for the proposition that a judge's independent decision not to suppress evidence, though erroneous, broke the chain of causation for officer's liability).

1    alleged in the complaint.  At this time, however, the Court will not determine the precise date

2    that Campbell's damages have been cut off.

3        **d.    Malicious Prosecution**

4        The general rule is that a malicious prosecution claim is not cognizable under § 1983 if

5    process is available in the state judicial system to provide a remedy.  Usher v. City of Los

6    Angeles, 828 F.2d 556, 561 (9th Cir. 1987); Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir.

7    1985) (en banc).  However, "an exception exists to the general rule when a malicious prosecution

8    is conducted with the intent to deprive a person of equal protection of the laws or is otherwise

9    intended to subject a person to a denial of constitutional rights."  Bretz, 773 F.2d at 1031.  Thus,

10   a malicious prosecution plaintiff "must show that the defendants prosecuted her with malice and

11   without probable cause, and that they did so for the purpose of denying her equal protection or

12   another specific constitutional right."  Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th

13   Cir. 1995).  A claim for malicious prosecution under 42 U.S.C. § 1983 incorporates the elements

14   of the state common law tort of malicious prosecution.  See Awabdy v. City of Adelanto, 368

15   F.3d 1062, 1066-68 (9th Cir. 2004); Usher, 828 F.2d at 562; Ayala v. KC Envtl. Health, 426

16   F.Supp.2d 1070, 1083 (E.D. Cal. 2006).   The elements for malicious prosecution of either a

17   criminal or civil proceeding under California law are that a prior action was commenced by or at

18   the direction of the defendant, was pursued to a legal termination in plaintiff's favor, was brought

19   without probable cause, and was initiated with malice.  Sagonowsky v. More, 64 Cal.App.4th

20   122, 128 (1998); Pattiz v. Minye, 61 Cal.App.4th 822, 826 (1998); Eells v. Rosenblum, 36

21   Cal.App.4th 1848, 1854 (1995).  With respect to the element of favorable termination, this

22   element "requires a termination reflecting the merits of the action and plaintiff's innocence of the

23   misconduct."  Pattiz, 61 Cal.App.4th at 826.  A termination is "not necessarily favorable simply

24   because the party prevailed in the prior proceeding; the termination must relate to the merits of

25   the action by reflecting either on the innocence of or lack of responsibility for the misconduct

26   alleged against him."  Sagonowsky, 64 Cal.App.4th at 128.  "If the resolution of the underlying

27   action leaves some doubt concerning plaintiff's innocence or liability, it is not a favorable

28                                        30

1    termination sufficient to allow a cause of action for malicious prosecution." Pattiz, 61

2    Cal.App.4th at 826; Eells, 36 Cal.App.4th at 1855.

3        Additionally, the general rule is that "the decision to file a criminal complaint is

4    presumed to result from an independent determination on the part of the prosecutor, and thus,

5    precludes liability for those who participated in the investigation or filed a report that resulted in

6    the initiation of proceedings." Awabdy, 368 F.3d at 1067; see Smiddy, 665 F.2d at 266-68.

7    However, the presumption of prosecutorial independence does not bar a subsequent section 1983

8    claim "against state or local officials who improperly exerted pressure on the prosecutor,

9    knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise

10   engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation

11   of legal proceedings." Awabdy, 368 F.3d at 1067; Ayala, 426 F.Supp.2d at 1083.

12       As applied to this case, Campbell's malicious prosecution is without merit.  The evidence

13   does not show that the criminal prosecution terminated in Campbell's favor.  Campbell was

14   convicted by a jury, but the conviction was reversed due to application of the exclusionary rule

15   for Fourth Amendment violations.  See DUMF No. 60; see also Campbell, 2003 Cal.App.

16   Unpub. LEXIS 3967 at *28-*30.  This termination does not suggest innocence or that Campbell

17   did not engage in misconduct.  The exclusionary rule excludes relevant and probative evidence

18   not because of a person's innocence, but rather to prevent violations of the Fourth Amendment.

19   See Lego v. Twomey, 404 U.S. 477, 488-89 (1972).  Since the reversal of Campbell's conviction

20   does not show favorable termination, Campbell cannot meet the first element of malicious

21   prosecution.  See Sagonowsky, 64 Cal.App.4th at 128; Pattiz, 61 Cal.App.4th at 826; Eells, 36

22   Cal.App.4th at 1855.  Furthermore, the evidence shows that the prosecutor exercised her

23   independent judgment to prosecute Campbell.  See DUMF Nos. 58, 76.  There is no indication

24   that the prosecutor was pressured or supplied false information by the Defendants.  Thus, as

25   discussed above, the prosecutor's independent judgment cuts off liability for malicious

26   prosecution as applied to the investigating officers.  Awabdy, 368 F.3d at 1067; see Smiddy, 665

27   F.2d at 266-68.  Additionally, there is no indication of a malicious motive against Plaintiffs since

28
                                         31

Charmley did not know Plaintiffs and, as discussed above, there was probable cause to make the arrest. Accordingly, summary judgment for Charmley on this claim is granted.

### e.     Abuse Of Process

In the Sixth Cause of Action, Campbell also alleges a Fourteenth Amendment right to be free from abuse of process. The allegations made in this claim are very similar to the allegations made in the Fifth Cause of Action for malicious prosecution. The Court has not found a Ninth Circuit case dealing with an abuse of process claim in the context of 42 U.S.C. § 1983. For purposes of this motion only, the Court will assume that Campbell has stated a valid claim. Just as the Ninth Circuit has incorporated the state law elements of malicious prosecution, the Court will assume that it would also incorporate the elements of abuse of process. Cf. Awabdy, 368 F.3d at 1066-68; Usher, 828 F.2d at 562; Ayala, 426 F.Supp.2d at 1083.

An "abuse of process" occurs when a person uses a legal process or procedure for a purpose that the process was not designed to achieve, that the use of legal process was done with an improper or ulterior motive, and the use caused harm. See Coleman v. Gulf Ins. Group, 41 Cal.3d 782, 792 (1986); Younger v. Solomon, 38 Cal.App.3d 289, 297 (1974); CACI § 1520. "Malicious prosecution and abuse of process are distinct. The former concerns a meritless lawsuit (and all damages it inflicted). The latter concerns the misuse of the tools the law affords litigants once they are in the lawsuit (regardless of whether there was probable cause to commence that lawsuit in the first place)." Bidna v. Rosen, 19 Cal.App.4th 27, 40 (1993). "The gist of the tort [of abuse of process] is the misuse of the power of the court: it is an act done under the authority of the court for the purpose of perpetrating an injustice." Younger, 38 Cal.App.3d at 297. The term "process" is not action taken without reference to the power of the court, rather, it is action taken pursuant to judicial authority and the term has been interpreted to encompass the entire range of procedures incident to litigation. See Adams v. Superior Court, 2 Cal.App.4th 521, 530 (1992); Younger, 38 Cal.App.3d at 296. The ulterior motive or improper purpose "is that the party employing the process did so for an end not germane thereto . . . [and] may consist in achievement of a benefit totally extraneous to or of a result not within the

legitimate scope of the process." Ion Equipment Corp. v. Nelson, 110 Cal.App.3d 868, 876 (1980).

Here, to the extent that obtaining and executing the search warrant could be considered an abuse of process, that claim is properly covered by the Fourth Amendment, which expressly governs searches and warrants, and reliance on Fourteenth Amendment substantive due process is improper. See Ramirez, 298 F.3d at 1029 ("Where a claim can be analyzed under 'an explicit textual source' of rights in the Constitution, a court may not also assess the claim under another, 'more generalized source.'"). Otherwise, there is no evidence that Charmley used any legal process or the "tools of litigation," let alone improperly utilized them for an improper, ulterior purpose. Charmley did not play a role in the prosecution of the case and was simply a witness. See DUMF Nos. 58, 70, 76. Although Campbell alleges ulterior purposes in his complaint, there is no evidence that shows an ulterior purpose. Cf. Willis, 244 F.3d at 682 (party resisting summary judgment cannot rely merely on the allegations in his complaint in order to create a genuine issue of material fact). Moreover, the legal process allegedly utilized by Charmley is not identified in the complaint. See Plaintiffs's Complaint at pp. 16-17. Accordingly, summary judgment in favor of Charmley on this claim is appropriate.

### f.    Constitutional Right To Familial Relationship

Defendants argue that the evidence fails to establish deliberate indifference and affirmatively establishes that Defendants were not responsible for the prosecution of Campbell; thus, Defendants did not violate Campbell's right to familial association. According to Campbell's complaint, the basis for this cause of action is his five month incarceration due to Defendants misrepresenting/planting evidence, suppressing exculpatory evidence, spoilation, and hiring and supervision policies. See Plaintiffs's Complaint at ¶¶ 66-72. However, Campbell does not offer evidence or make a specific argument with respect to this claim in opposition to summary judgment, other than to say that he was denied his right to familial association.

Defendants have filed an unchallenged proposed fact that they did not act recklessly, intentionally, or with deliberate indifference to Campbell's right to familial association, nor did

33

Defendants know Campbell or that Campbell was related to Nolan Campbell.  See DUMF Nos.

67, 71.  Defendants focus on post search conduct in moving for summary judgment, and

Campbell does not argue that such focus is improper.  As discussed above, the evidence shows

that there was probable cause for Campbell's arrest, see DUMF Nos. 26-54, and that Prosecutor

Lane exercised her independent judgment to prosecute Campbell.  See DUMF No. 58, 69, 70, 76.

Despite the allegations in the complaint, Campbell has presented no evidence that Defendants

engaged in spoilation, evidence planting, or improper evidence suppression.  Thus, Campbell's

arrest was not unwarranted and Defendants did not direct or decide the post-arrest actions of the

prosecutor.  See id.; Motley v. Parks, 432 F.3d 1072, 1082 (9th Cir. 2005); Alvarez-Machain,

331 F.3d at 636.  Summary judgment in favor of Charmley on this claim is appropriate.

### g.    42 U.S.C. § 1983 Conspiracy

To prove conspiracy under 42 U.S.C. § 1983, a plaintiff must show an agreement or a

meeting of the minds to violate the plaintiffs's constitutional rights.  See Vieux v. E. Bay Reg'l

Park Dist., 906 F.2d 1330, 1343 (9th Cir. 1990); Woodrum v. Woodward County, 866 F.2d

1121, 1126 (9th Cir. 1989); Stone v. Baum, 409 F.Supp.2d 1164, 1176 (D. Ariz. 2005).

In their complaint, Plaintiffs allege that the Defendants cobbled together an affidavit

without probable cause and knew that the magistrate would carelessly sign the warrant and

agreed to justify their search by planting and/or moving the location of and rearranging evidence

so as to appear suspicious.  See Plaintiffs's Complaint at pp. 11-12.  In furtherance of this

conspiracy, Plaintiffs allege that the search was unreasonably prolonged, that exculpatory and

impeachment evidence was ignored, that evidence was planted and manufactured, and that false

testimony and reports were made.  Id.  The goal of the conspiracy was to convict and imprison

Campbell for a crime that Campbell did not commit.  Id.

However, no factual support has been provided for any of the above allegations.

Plaintiffs have not identified evidence that shows that evidence was improperly rearranged or

that incriminating evidence was planted.  Furthermore, Plaintiffs have failed to identify what

testimony or reports were false.  Moreover, Defendants have all filed declarations indicating that

none of them entered any agreement or acted in concert to violate the rights of Campbell or Jeffcoat.  See DUMF No. 68; Carvel Declaration at ¶ 11;Charmley Declaration at ¶ 35; Love Declaration at ¶ 16; Pryor Declaration at ¶ 5.  Plaintiffs have presented no contrary evidence to Defendants's "anti-conspiracy" declarations.  For summary judgment purposes, once a party meets his initial burden, the responding party can no longer rely on the allegations and denials of her pleadings and must present evidence to the court.  Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis, 244 F.3d at 682.  Because Plaintiffs have failed to present evidence to the Court that supports the existence of a conspiracy or a "meeting of the minds" to violate Plaintiffs's constitutional rights, summary judgment in favor of Charmley is appropriate.  See Vieux, 906 F.2d at 1343; Woodrum, 866 F.2d at 1126; Stone, 409 F.Supp.2d at 1176.

### h.    Supervisor Liability

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005); Larez v. Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

Charmley argues that summary judgment is appropriate because all of the officers acted pursuant to a presumably valid warrant and executed the warrant in a reasonable manner.  As discussed below, with the search warrant comes the ability to detain occupants of a building, but the evidence suggests that the detention of Jeffcoat was conducted in an unreasonable manner.  The validity of the search warrant does not bear on the reasonableness of the manner of Jeffcoat's detention by Carvel during the search.  Charmley does not address his potential liability as a supervisor for Carvel's conduct towards Jeffcoat.  Thus, summary judgment in favor of Charmley for supervisor liability for the conduct of Carvel is denied.

### 2.    CLAIMS AGAINST LOVE

35

1          **a.      The Search Warrant**

2          The evidence presented indicates that the warrant in this case was not supported by

3     probable cause. Love did not obtain the search warrant and remained "on point" during the

4     operation briefing to maintain visual surveillance of Campbell's home until the search

5     commenced.  DUMF No. 20.  During the search, Love participated in his capacity as a Certified

6     Bakersfield Police Department Vice/Narcotics Clandestine Laboratory Investigator.  DUMF No.

7     21.  In that capacity, Love looked in the trunk of Jeffcoat's car, observed bottles of iodine and

8     peroxide in Plaintiffs's home, searched a trash bag in the kitchen, found approximately 14 used

9     blister packs, a can of denatured alcohol, various pieces of glassware, and boxes of used and

10    unused coffee filters.  See DUMF Nos. 26-31.  Love therefore appears to be a type of line officer,

11    but did not participate in the operation briefing by Charmley.  However, Love declares that he

12    "relied on the apparent validity of the search warrant signed by Judge Staley when [he]

13    participated in the search of the Campbell home."  Love Declaration at ¶ 22; see DUMF No. 74.

14    Plaintiffs have not provided any evidence or argument that Love's search exceeded or was

15    contrary to the search authorized by the signed search warrant, nor does the evidence so suggest.

16    Furthermore, Plaintiffs do not argue that the warrant was obviously defective, but instead rely on

17    the absence of probable cause.  See Plaintiffs's Opposition at p.2.  But, there is  no requirement

18    that the warrant articulate the foundation for a finding of probable cause and Love was not

19    required to read the probable cause affidavits before relying on the warrant.  See Ramirez, 298

20    F.3d at 1027-28; Mills, 930 F.2d at 732.  The specific evidence presented to the Court indicates

21    that Love was familiar with the contents of, and reasonably relied on, the search warrant while

22    participating in the search of Plaintiffs's home and vehicle.  See Ramirez, 298 F.3d at 1027-28;

23    Marks, 102 F.3d at 1029-30; DUMF No. 74; Love Declaration at ¶ 22.  Accordingly, Love is

24    entitled to qualified immunity on this claim.

25         **b.      Reasonableness Of The Execution Of The Search Warrant**

26         With the exception of the questioning of Jeffcoat which is discussed below, there is no

27    indication that the manner in which Love searched the Campbell home was unreasonable.

28                                                    36

Furthermore, Charmley, and not Love, was the case agent, and  Pryor, and not Love, was the officer who supervised the search.  See DUMF Nos. 16, 22.  Since Love did not search in an unreasonable manner, he is not liable.  See Motley, 432 F.3d at 1082.   Summary judgment in favor of Love on this claim is appropriate.

### c.      False Arrest/False Imprisonment

Under this claim, Jeffcoat argues that Defendants violated her constitutional rights by asking juvenile and sexist questions, specifically asking about Jeffcoat's menstrual cycle.  Love was the officer who asked these questions and did so because filters where found in the kitchen. See DUMF No. 36.   The questions by Love do not show a violation of the Fourth Amendment; "[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983."  Lundy v. City of Kalamazoo, 1993 U.S. Dist. LEXIS 15848 (W.D. Mich. 1993) (quoting Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987)); see also Freeman v. Arpaio, 125 F.3d 732, 738 (9th Cir. 1997); Raisdana v. Wichita, 1993 U.S. Dist. LEXIS 10922 at *34-*35 (D. Kan. 1993).  Further, Love was not the officer who arrested Campbell or kept Jeffcoat in custody.  Rather, Charmley was the arresting officer, see DUMF No. 57, and Carvel guarded Jeffcoat.  See DUMF No. 22.  Since Love did not arrest or seize Plaintiffs, he is not liable.  See Motley, 432 F.3d at 1082.  Summary judgment in favor of Love on this claim is appropriate.

### d.      Malicious Prosecution

For the same reasons that summary judgment is appropriate as to Charmley, summary judgment in favor of Love on Plaintiffs's Fourteenth Amendment malicious prosecution claim is granted.

### e.      Abuse Of Process

For the same reasons that summary judgment is appropriate as to Charmley, summary judgment in favor of Love on Plaintiffs's Fourteenth Amendment abuse of process claim is granted.

### f.      Constitutional Right To Familial Relationship

37

1    Love did not arrest Campbell, and, as discussed above, Lane executed her independent

2    judgment to prosecute Campbell.   Since the evidence does not show a violation of Campbell's

3    right to familial association, summary judgment in favor Love is appropriate.  See Motley, 432

4    F.3d at 1082; Alvarez-Machain, 331 F.3d at 636; Lee, 250 F.3d at 685; DUMF Nos. 58, 67, 76.

5        **g.**      **42 U.S.C. § 1983 Conspiracy**

6        For the same reasons that summary judgment is appropriate as to Charmley, summary

7    judgment in favor of Love on Plaintiffs's 42 U.S.C. § 1983 conspiracy claim is granted.  See

8    Vieux, 906 F.2d at 1343; Woodrum, 866 F.2d at 1126; Stone, 409 F.Supp.2d at 1176.

9

10   **3.     CLAIMS AGAINST CARVEL**

11       **a.      The Search Warrant**

12       Officer Carvel guarded Plaintiffs during the search.  See DUMF No. 22.  There is no

13   evidence that Carvel conducted any search of the Plaintiffs's residence or vehicle.  Since Carvel

14   did not search, he did not violate Plaintiffs's Fourth Amendment right against unreasonable

15   searches.  See Motley, 432 F.3d at 1082.  Summary judgment in favor of Carvel on Plaintiffs's

16   first cause of action is appropriate.

17       **b.      Reasonableness Of The Execution Of The Search Warrant**

18       Officer Carvel guarded Campbell and Jeffcoat, see DUMF No. 22, and there is no

19   evidence that Carvel actually searched the residence, Campbell, or the vehicle. Summary

20   judgment in favor of Carvel on this claim is appropriate.[14]  See Motley, 432 F.3d at 1082.

21       **c.      False Arrest/False Imprisonment**

22       Officer Carvel did not arrest Campbell.  Campbell does not complain about the manner of

23   his detention during the search, and Campbell could lawfully be detained during the pendency of

24   the search.  See Dawson v. City of Seattle, 435 F.3d 1054, 1066 (9th Cir. 2006).  Accordingly,

25   summary judgment in favor of Carvel on Campbell's claim is appropriate.  See Dawson, 435

26   _____

27       [14]Jeffcoat's complaints about her detention during the execution of the search warrant is addressed under
     the "False Arrest/False Imprisonment" section below.

28                                                    38

1    F.3d at 1066; <u>Motley</u>, 432 F.3d at 1082.

2         With respect to Jeffcoat, she complains that Carvel detained her during the entire search,

3    kept her in handcuffs, and, despite her requests, refused to let her use the toilet during the 8 to 10

4    hour search.

5

6              **(1)      Detention**

7         With respect to detaining Jeffcoat, an officer's authority to detain an occupant of a

8    building that is being searched pursuant to a warrant is categorical and "does not depend on the

9    quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure."

10   <u>Muehler v. Mena</u>, 544 U.S. 93, 98 (2005); <u>Dawson</u>, 435 F.3d at 1066.  Since detention of a

11   building's occupants is "coextensive with the period of the search" and "require[s] no further

12   justification," Carvel did not violate Jeffcoat's rights simply by detaining her during the entire

13   duration of the search.[15]  <u>Dawson</u>, 435 F.3d at 1066.

14             **(2)      Use Of Handcuffs**

15        With respect to using handcuffs, at paragraphs 10 and 49 of Plaintiffs's complaint,

16   Jeffcoat complains about her seizure and being handcuffed.  Defendants acknowledge that

17   Jeffcoat was hancuffed, <u>see</u> DUMF No. 25, but do not address the propriety of handcuffs in their

18   motion for summary judgment.  Use of handcuffs during a search may violate the Fourth

19   Amendment.  <u>See</u> <u>Meredith v. Erath</u>, 342 F.3d 1057, 1059-60 (9th Cir. 2003).  The mere fact that

20   a search warrant was obtained does not change the requirement that a detention must be

21   conducted in a reasonable manner.  <u>Dawson</u>, 435 F.3d at 1066.  Because Defendants have not

22   addressed the claim, the Court will not pass on its viability; the claim will remain.

23             **(3)      Refusal To Use The Toilet**

24        The ability to detain an occupant of a residence while a search warrant is executed is

25   categorical and the detention is coexistent with the period of the search.  <u>Dawson</u>, 435 F.3d at

26   ───────────────

27   [15]There is no evidence or argument that Carvel's reliance on the search warrant was unreasonable.  <u>See</u>
     <u>Ramirez</u>, 298 F.3d at 1027-28; DUMF Nos. 17, 18, 74.

28                                        39

1066.  However, officers do not have unfettered authority to detain a building's occupants in any

manner that they see fit; the manner of detention must be reasonable under the circumstances.  Id.

The reasonableness of a detention made pursuant to a search warrant is examined under the

totality of the circumstances and includes consideration of, *inter alia*, any danger posed to the

police by the detainee, the nature of the crime being investigated/the object of the search, any

resistance by the detainee, the age of the detainee, and the health or medical condition of the

detainee.  See Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994).  "A detention conducted

in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or

prolonged, or if it involves an undue invasion of privacy."  Id.  In 2003, the Ninth Circuit

reiterated that a detention of an occupant during a search pursuant to warrant must be done in a

reasonable manner and that the police have limited powers while detaining building occupants.

See Ganwich v. Knapp, 319 F.3d 115, 1124 n.15 (9th Cir. 2003).  The Ninth Circuit cited as an

example that was consistent with their approach *Heitschmidt v. City of Houston*, 161 F.3d 834,

837-38 (5th Cir. 1998).  Id.  The Ninth Circuit characterized *Heitschmidt* as "holding that

handcuffing and denying a plaintiff bathroom breaks during the search of his residence was not

within the scope of a permissible detention under *Summers* [*v. Michigan*]."  Ganwich, 319 F.3d

at 1024 n.15.  *Heitschmidt* involved the execution of a search warrant where the plaintiff was

pushed onto the trunk of his car, handcuffed in public, was in pain, and was denied the use of the

bathroom during a search that lasted approximately 4 hours.  See Heitschmidt, 161 F.3d at 838.

In this case, Jeffcoat testified that she requested to use the restroom three times during the

9-hour search.  See Jeffcoat Deposition at pp. 117-19.  Jeffcoat first asked to use the toilet

approximately two hours after the search began.  Id. at 117.  Two hours later, Jeffcoat asked for a

second time to use the toilet.  Id. at 118.  Two hours later, Jeffcoat again asked to use the toilet

and said that she really had to go.  Id. at 119.  Jeffcoat further testified that she was in discomfort

and pain while waiting to use the restroom, but suffered no injury after she used the restroom.  Id.

at 123.  Given the time frames involved, the testimony indicates the last time Jeffcoat asked to

use the restroom was approximately 10:00 or 11:00 p.m.  Between approximately 10:00 p.m. or

11:00 p.m. and 2:00 a.m. (the conclusion of the search), there is no testimony that Jeffcoat made any other requests to use the restroom nor is there evidence that Jeffcoat soiled herself.  Carvel did not let Jeffcoat use the restroom during the entirety of the search because no female police officer was present.  See DUMF No. 23.  However, crime lab specialist Sherrie Hill was present at the Campbell residence between approximately 8:20 p.m. and 10:40 p.m.  See DUMF No. 43. It is unclear why Hill could not accompany Jeffcoat to the restroom.  Jeffcoat was a resident of the residence listed in the search warrant, it does not appear that she informed Carvel of any medical problems or disabilities, and there is no indication that Jeffcoat posed a reasonable danger to the officers.  However, it appears that Jeffcoat was detained for approximately nine hours and three times was denied three requests, made over a 6-hour period, to use the restroom. While limiting the use of a toilet while searching for drugs is reasonable given that a toilet is a convenient way of disposing of contraband, see Hunter v. Namanny, 219 F.3d 825, 831 (8th Cir. 2000), the search lasted longer than the four hours involved in *Heitschmidt*.  Viewed in the light most favorable to Jeffcoat, the Court believes that a jury could find a violation of the Fourth Amendment given the duration of the search, the multiple requests to use the restroom, and the presence of a female crime lab specialist.  Cf. Heitschmidt, 161 F.3d at 837-38; Franklin, 31 F.3d at 876.

Since the evidence could support a violation of the Constitution, the Court must determine whether a reasonable officer in Carvel's position could believe that his conduct was lawful.  The concept that a detention pursuant to a search warrant should not be unnecessarily prolonged, degrading, or painful was clearly established in the Ninth Circuit in 1994.  See Franklin, 31 F.3d at 876.  *Heitschmidt* was decided in 1998, but it is a Fifth Circuit case and was not cited by a Ninth Circuit court until *Ganwich* in 2003.  In 2000, the year of the search in the case at bar, the Eighth Circuit held:

> We find no authority for the existence of a right on the part of one who is lawfully detained pursuant to the execution of a search warrant to use a toilet upon demand. Although Hunter's dignity was certainly compromised by what transpired as the search was conducted, we are unable to conclude that the Constitution requires that police engaged in a search for drugs allow a resident of

1   the subject property access to a ready means of disposal of such contraband.

2   Hunter, 219 F.3d at 831 (citations omitted).

3   Defendants rely on *Hunter* to argue that Carvel did not violate Jeffcoat's Fourth Amendment

4   rights.  In *Hunter*, the search lasted one and a half hours, the plaintiff informed the police that she

5   was disabled and taking medication and had to frequently use the restroom, the plaintiff was

6   denied use of the restroom, and the plaintiff urinated and defecated on herself.  Id. at 827-28.

7   Although the *Hunter* Court is correct that there is no *per se* right to use the restroom upon request

8   during a search, a detention pursuant to a search warrant may become unreasonable if it is

9   unnecessarily prolonged, degrading or painful; viewed in the light most favorable to Jeffcoat,

10  three refusals to use the restroom after six hours is arguably unnecessarily degrading and painful.

11  See Franklin, 31 F.3d at 876.  The search in this case lasted considerably longer than the searches

12  in *Heitschmidt* and *Hunter*, although it did not end in the degrading manner of *Hunter*.  There

13  was no Ninth Circuit case in 2000 that was directly on point, but the principles enunciated in

14  *Franklin* were clearly established 1994 and *Franklin* suggests a constitutional violation in this

15  case.  Accordingly, the Court cannot conclude as a matter of law that a reasonable officer in

16  Carvel's position would have believed that his conduct was lawful by refusing Jeffcoat's multiple

17  requests to use the restroom during the approximately 9-hour search.  Summary judgment and

18  qualified immunity with respect to this claim is denied.  See Ganwich, 319 F.3d at 1024 n.15;

19  Heitschmidt, 161 F.3d at 827-28; Franklin, 31 F.3d at 876.

20      Defendants argue that since Jeffcoat did not suffer any permanent or long term injuries

21  from the denial of toilet facilities, nor did she seek medical treatment, her constitutional injury is

22  *de minimis* and not actionable.  Defendants cite no Ninth Circuit cases that adopt a view that a

23  non-prisoner's constitutional injury may be *de minimis* and non-actionable.  In the Ninth Circuit,

24  "nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights."

25  George v. Long Beach, 973 F.2d 706, 708 (9th Cir. 1992); Floyd v. Laws, 929 F.2d 1390, 1401

26  (9th Cir. 1991); Romberg v. Nichols, 953 F.2d 1152, 1161 (9th Cir. 1992).  Thus, even if a

27  plaintiff cannot prove "non-nominal" damages, but does prove a violation of her constitutional

28

rights, nominal damages must be awarded and she will receive a recovery, albeit a symbolic one. George, 973 F.2d at 708; Ninth Circuit Model Inst. No. 7.6 (2001 Ed.).  As discussed above, a trier of fact could reasonably find a violation of the Fourth Amendment based on the repeated failure to allow access to toilet facilities over an approximately 9-hour period.  Although a trier of fact may well determine that Jeffcoat's actual damages were *de minimis*, she would still be entitled to nominal damages of $1 if the jury found a constitutional violation.[16]  See Ninth Circuit Model Inst. 7.6 (2001 Ed.).  Summary judgment in favor of Carvel on the basis of a *de minimis* injury is denied.

### d.      Malicious Prosecution

For the same reasons that summary judgment is appropriate as to Charmley and Love, summary judgment in favor of Carvel on Plaintiffs's Fourteenth Amendment malicious prosecution claim is granted.

### e.      Abuse Of Process

For the same reasons that summary judgment is appropriate as to Charmley and Love, summary judgment in favor of Carvel on Plaintiffs's Fourteenth Amendment abuse of process claim is granted.

### f.      Constitutional Right To Familial Relationship

Carvel did not arrest Campbell, and, as discussed above, Lane executed her independent judgment to prosecute Campbell.   Since the evidence does not show a violation of Campbell's right to familial association, summary judgment in favor Carvel is appropriate.  See Motley, 432 F.3d at 1082; Alvarez-Machain, 331 F.3d at 636; Lee, 250 F.3d at 685; DUMF Nos. 58, 67, 76.

### g.      42 U.S.C. § 1983 Conspiracy

For the same reasons that summary judgment is appropriate as to Charmley and Love, summary judgment in favor of Love on Plaintiffs's 42 U.S.C. § 1983 conspiracy claim is granted. See Vieux, 906 F.2d at 1343; Woodrum, 866 F.2d at 1126; Stone, 409 F.Supp.2d at 1176.

---

[16]Jeffcoat further testified that she experienced pain and discomfort during the 9-hour detention because she was denied access to a toilet.  See Jeffcoat Deposition at 123:5-7.

**4.    CLAIMS AGAINST PRYOR**

    **a.    The Search Warrant**

Pryor was the officer who supervised the search, see DUMF No. 22, but was not the case agent or the officer who obtained the warrant.  See DUMF Nos. 16.  Before the search, Pryor was told by Charmley that a search warrant had been obtained and also attended Charmley's briefing.  See DUMF Nos. 17-18.  Pryor has filed a declaration that states that he relied on the signed warrant to conduct the search.  See Pryor Declaration at ¶ 7; DUMF No. 74.  There is nothing obviously defective about the search warrant and there is no suggestion or any argument by Plaintiffs that the warrant was facially overbroad, that Pryor's reliance on the warrant was unreasonable, or that Pryor's search exceeded the scope that was authorized by the search warrant.  See Plaintiffs's Opposition at p.2; cf. Campbell, 2003 Cal. App. Unpub. LEXIS at *28 (noting the Leon bases for excluding evidence obtained under a warrant, which includes facial deficiency, but noting that the only applicable Leon exception was for an affidavit that lacked the indicia of probable cause).  Furthermore, there is no requirement that the warrant articulate the foundation for the finding of probable cause and Plaintiffs present no authority that requires an officer to read the accompanying probable cause affidavit to ensure that probable cause actually exists, irrespective of the magistrate's determination.  See Ramirez, 298 F.3d at 1027-28; Mills, 930 F.2d at 732.  The evidence submitted does not show that Pryor's conduct was reckless or indifferent to the rights of Campbell and Jeffcoat or that his reliance on the warrant was unreasonable.  See Ramirez, 298 F.3d at 1027-28; Mills, 930 F.2d at 732; cf. Campbell, 2003 Cal. App. Unpub. LEXIS at *28.  Qualified immunity in favor of Pryor on this claim is granted.

    **b.    Reasonableness Of The Execution Of The Search Warrant**

As discussed above, there is no evidence that the actual search of the Plaintiffs's residence or vehicle was done in an unreasonable manner.  Summary judgment in favor of Pryor on the manner of the search is granted.

    **c.    False Arrest/False Imprisonment**

Pryor did not detain/guard Campbell or Jeffcoat, and there is no evidence that Pryor denied Jeffcoat use of the restroom.  Summary judgment in favor of Pryor on this claim is appropriate.  See Motley, 432 F.3d at 1082.

### d.    Malicious Prosecution

For the same reasons that summary judgment is appropriate as to Charmley, Love, and Carvel, summary judgment in favor of Pryor on Plaintiff's Fourteenth Amendment malicious prosecution claim is granted.

### e.    Abuse Of Process

For the same reasons that summary judgment is appropriate as to Charmley, Love, and Carvel, summary judgment in favor of Pryor on Plaintiff's Fourteenth Amendment abuse of process claim is granted.

### f.    Constitutional Right To Familial Relationship

Pryor did not arrest Campbell, and, as discussed above, Lane executed her independent judgment to prosecute Campbell.   Since the evidence does not show a violation of Campbell's right to familial association, summary judgment in favor Pryor is appropriate.  See Motley, 432 F.3d at 1082; Alvarez-Machain, 331 F.3d at 636; Lee, 250 F.3d at 685; DUMF Nos. 58, 67, 76.

### g.    42 U.S.C. § 1983 Conspiracy

For the same reasons that summary judgment is appropriate as to Charmley, Love, and Carvel, summary judgment in favor of Love on Plaintiffs's 42 U.S.C. § 1983 conspiracy claim is granted.  See Vieux, 906 F.2d at 1343; Woodrum, 866 F.2d at 1126; Stone, 409 F.Supp.2d at 1176.

### h.    Supervisor Liability

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  Menotti, 409 F.3d at 1149; Larez, 946 F.2d at 646.

Defendants argue that a supervisor cannot be liable if he is merely negligent in failing to detect and prevent a subordinate's misconduct and Charmley obtained the search warrant that authorized the search in question.  Since Pryor did not obtain the warrant and relied on the warrant in searching, he did not promote, participate, or endorse the allegedly illegal search.  Plaintiffs make no argument or present any evidence with respect to this claim against Pryor.

The thrust of the motion for summary judgment is that Pryor relied on the search warrant.  That a search warrant exists does not speak to the reasonableness of the manner of Jeffcoat's detention.  The evidence indicates that Pryor supervised the search.  See DUMF No. 22.  The scope of that supervision is not discussed and Pryor does not address his responsibility over Carvel or the detention of Jeffcoat or whether he knew about Jeffcoat's requests.  In the absence of evidence that delineates the scope of Pryor's knowledge and extent of his duties as the supervisor of the search, the Court cannot grant Pryor summary judgment on this claim with respect to the actions of Carvel.

However, to the extent that Pryor was Charmley's superior, cf. DUMF Nos. 16, 22 with Plaintiffs's Complaint at ¶ 30, Plaintiffs have failed to produce evidence or refute Pryor's argument that he relied on Charmley and the signed search warrant.  Given the reliance by Pryor on the warrant, and the absence of evidence that shows acquiescence, improper supervision, or deliberate indifference by Pryor, or unreasonable reliance on the warrant, summary judgment in favor of Pryor for Charmley's conduct is granted.

**5.     CLAIMS AGAINST CHIEF MATLOCK – SUPERVISOR LIABILITY**

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  Menotti, 409 F.3d at 1149; Larez, 946 F.2d at 646.

There is no evidence that shows Chief Matlock participated in any way in the search of

Plaintiffs's residence, that shows Matlock was even aware of the search at the time it occurred, or that shows Matlock played any role in the prosecution of this case. See DUMF Nos. 58, 70, 76, 78. The only evidence presented to the Court is that Matlock was unaware of the search and search warrant. There is no evidence that Matlock implemented improper supervisory policies or that his control and supervision of his officers makes him culpable for the search in this case. Given Matlock's non-involvement and the lack of evidence showing any culpable conduct on Matlock's part, summary judgment in favor of Matlock on all claims is granted. See Motley, 432 F.3d at 1082; Menotti, 409 F.3d at 1149; Larez, 946 F.2d at 646.

**6.    CLAIMS AGAINST THE CITY OF BAKERSFIELD**

*Monell* and *City of Canton* **Liability – Negligent Hiring & Training**

Municipal liability cannot be based on a theory of *respondeat superior*. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978). However, a municipality may be sued under 42 U.S.C. § 1983 if "the action that is alleged to be unconstitutional implemented or executed a policy statement, ordinance, regulation, or decision [that] officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690. Even if a municipality does not expressly adopt the alleged policy, the municipality may still be liable if the employee commits a constitutional violation pursuant to a long-standing practice or custom or, in the case of an isolated constitutional violation, when the person causing the violation has final policymaking authority. Webb v. Sloan, 330 F.3d 1158, 1163-1164 (9th Cir. 2003). If the employee does not have final policymaking authority, "[a] single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." Id. The plaintiff must demonstrate that there is a "direct causal link" between the municipal policy, custom, or practice and the violation of the plaintiff's constitutional rights. City of Canton v. Harris, 489 U.S. 378, 385 (1989); McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000). In other words, "the policy must be the proximate cause of the § 1983 injury." Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

Additionally, a municipal entity may be liable for constitutional violations resulting from

47

its failure to supervise and train, but only where the inadequacy of the supervision and training amounts to deliberate indifference.  City of Canton, 489 U.S. at 388; Mackinney v. Nielsen, 69 F.3d 1002, 1010 (9th Cir. 1995); Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989).   A municipality is deliberately indifferent when it is "on actual or constructive notice of the need to train."  Farmer v. Brennan, 511 U.S. 825, 841 (1994); Hupp v. City of Walnut Creek, 389 F.Supp.2d 1229, 1234 (N.D. Cal. 2005).  There needs to be a close causal nexus between the alleged deficient supervision and training and the injury suffered.  Only where a failure to supervise and train reflects a "'deliberate' or 'conscious' choice" by a local government can the local government be liable under section 1983.  City of Canton, 489 U.S. at 389.  Further, the plaintiff must demonstrate that the alleged deficiency in supervision and training actually caused the requisite indifference.  Id. at 391. The appropriate inquiry is therefore whether the injury would have been avoided "had the employee been trained under a program that was not deficient in the identified respect."  Id.; see also Lee, 250 F.3d at 681.

Plaintiffs allege in their complaint that the City of Bakersfield ("the City") hires unqualified personnel, hires and retains employees who are not interested in the pursuit of justice, hires and retains employees who fabricate evidence to obtain convictions, hires and retains officers who make false and misleading statements and who create or plant evidence, hires and retains personnel who fail to properly investigate a crime or who suppress exculpatory evidence, and maintains a substandard crime lab.  However, the evidence presented does not suggest that any of these claims have a basis in fact or occurred in this case.

There is no evidence of either a failure to train or deliberate indifference by the City.  At the time of the search, Carvel, Charmley, Love, and Pryor had all maintained their certifications to be peace officers in the state of California, which includes a minimum of 24 hours of additional training every two years.  See DUMF No. 77.  Further, the City specifically provides its officers three business days per year to attend the training of their choice.  Id.  Plaintiffs have not presented evidence that the officers where somehow undertrained or, by way of example only, that multiple complaints regarding searches conducted by these officers had been made.

Importantly, Plaintiffs have presented no evidence identifying what additional training should have been conducted or how that training would have made a difference in this case.  See City of Canton, 489 U.S. at 391.

Further, no evidence has been presented to the Court that any of the officers in the search suppressed exculpatory information, gave false testimony or statements, fabricated evidence, or that the crime lab's work in this case was "substandard."  Arguably applying for a search warrant where probable cause did not actually exist constitutes a failure to properly investigate a claim.  However, there is no evidence that there is a policy or custom of the City to have its officers apply for warrants without probable cause or to detain people in an unreasonable manner.  The only evidence presented to this Court is a single incident by Charmley and a single incident by Carvel, and there is no evidence that Charmley or any of the officers involved in the search had "final policy making authority."  As such, the single incidence that is this case is insufficient to establish a custom.  See Webb, 330 F.3d at 1163-64.

Because Plaintiffs have not presented evidence suggesting either that the City failed to adequately train or properly hire its officers, that the City acted with deliberate indifference, or that a policy or custom of the City caused the complained of seizure of Jeffcoat and searches, summary judgment in favor of the City on these claims is granted.  See City of Canton, 489 U.S. at 385, 389-91; Webb, 330 F.3d at 1163-64; Butler, 281 F.3d at 1028; Fordyce v. City of Seattle, 55 F.3d 436, 440 (9th 1995).


**CONCLUSION**

Plaintiffs allege multiple causes of action based on the search of Plaintiffs's vehicle and residence and the subsequent arrest and prosecution of Campbell.  Summary judgment on most of these claims is appropriate.

With respect to the search of Plaintiffs's residence and vehicle, the evidence presented does not support as a matter of law either a finding of probable cause or good faith reliance on the warrant by Charmley.  Summary judgment and/or qualified immunity in favor of Charmley

on this claim will be denied.  However, Charmley was the only officer who swore out an affidavit and was the officer who obtained the warrant.  The other officers who participated in the search reasonably relied on Charmley's representations/briefing and the signed warrant. Plaintiffs focus on the absence of probable cause, but a warrant does not have to articulate the foundation for its conclusion of probable cause.  Further, there is no evidence that the search was conducted in an unreasonable manner.  Because the evidence shows that Love, Carvel, and Pryor reasonably relied on the warrant obtained by Charmley, they are entitled to qualified immunity on this claim and summary judgment in favor of these Defendants is appropriate.

With respect to the second cause of action for false arrest/false imprisonment, probable cause existed to arrest Campbell and he does not challenge the reasonableness of his detention. Thus, summary judgment in favor of all Defendants is appropriate.  As to Jeffcoat, Defendants do not address her handcuffing claim and the denial of the use of a toilet over a nine hour period, despite three requests, indicate an unreasonable seizure that a reasonable officer would be aware of.  Carvel is the only officer identified who guarded/maintained the detention of Jeffcoat.  Thus, summary judgment on Jeffcoat's second cause of action with respect to the manner of her detention, specifically the use of handcuffs and the denial of the use of a toilet, is denied with respect to Carvel, but granted with respect to the remaining Defendants.

With respect to the third cause of action for conspiracy, summary judgment in favor of all defendants is appropriate because there is no evidence of a meeting of the minds/agreement to violate constitutional rights.

With respect to the fourth cause of action for interference with familial relationship, the claim is based on post-search conduct, but the evidence shows that probable cause existed for Campbell's arrest and that Prosecutor Lane exercised her independent judgment to prosecute Campbell.  Campbell has failed to show that his right to familial association was deliberately and unwarrantedly interfered with.  Summary judgment in favor of all Defendants on this claim is appropriate.

With respect to the fifth cause of action for malicious prosecution, the evidence shows

that the prosecutor exercised her independent judgment and Campbell has failed to establish a favorable termination, as that term is understood in law.  Summary judgment is appropriate in favor of all Defendants on this claim.

With respect to the sixth cause of action for abuse of process, Cambpell has failed to identify any legal process that was utilized for any improper purpose by any of the Defendants. Summary judgment in favor of all Defendants is appropriate on this claim.

With respect to the seventh cause of action for *Monell* liability, Plaintiffs have failed to identify a deficient policy, custom or practice of the City that caused any injury, the evidence establishes that the officers who took part in the search were not unqualified, and there is no evidence of improper hiring.  Summary judgment in favor of the City is appropriate.

With respect to the eighth cause of action for *City of Canton* liability, there is no evidence that shows the City on notice of the need for additional training, nor does Campbell identify what additional training was necessary or how that additional training would have prevented the searches in this case.  Summary judgment for the City is appropriate.

With respect to the ninth cause of action for *Larez* liability, summary judgment in favor of Matlock is appropriate as there is no evidence that Matlock was aware of the search, acquiesced in the search, acted with deliberate indifference, or that his supervision is responsible for the search or claimed injuries.  Summary judgment in favor of Matlock is appropriate.

With respect to Charmley and Pryor, both of these Defendants rely on the validity of the warrant to support summary judgment.  It is unclear, but to the extent that Pryor was Charmley's supervisor, Plaintiffs have failed to show that Pryor's reliance on the warrant obtained by Charmley was unreasonable and have failed to produce evidence that suggests a violation of *Larez*.  Summary judgment in favor of Pryor for his supervision of Charmley, if applicable, is appropriate.

With respect to both Pryor and Charmley's supervision of Carvel, a detention during the execution of a search warrant must be reasonable.  Since the validity of the search warrant does not deal with the manner of the detention during the search, and Defendants have not addressed

the propriety of supervisor liability with respect to the manner of Carvel's detention of Jeffcoat, summary judgment in favor of Pryor and Charmley on Jeffcoat's ninth cause of action will be denied.

From the above, the only claims that remain in this case are both Plaintiffs's claims for unreasonable searches against Charmley, Jeffcoat's claim for unreasonable detention during the execution of the search warrant against Carvel based on the use of handcuffs and refusal to use the toilet during the 9-hour detention, and *Larez*/supervisor liability against Charmley and Pryor for the manner of Carvel's detention of Jeffcoat.  Further, due to the independent judgment of Prosecutor Lane, damages in this case are unavailable to Campbell from the time Lane exercised her independent judgment, to prosecute to the conclusion of the state criminal proceedings in 2003.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Summary judgment in favor of Mark Charmley with respect to Plaintiffs's second, third, fourth, fifth, and sixth causes of action is GRANTED;

2.  Summary judgment in favor of Mark Charmley with respect to Jeffcoat's ninth cause of action is DENIED;

3.  Summary judgment in favor of Mark Charmley with respect to Campbell's ninth cause of action is GRANTED;

3.  Summary judgment and/or qualified immunity in favor of Mark Charmley with respect to Plaintiffs's first cause of action is DENIED;

4.  Summary judgment and/or qualified immunity in favor Orbin Love on all of Plaintiffs's causes of action is GRANTED;

5.  Summary judgment in favor of Scott Carvel with respect to Plaintiffs's first, third, fourth, fifth and sixth causes of action is GRANTED;

6.  Summary judgment and/or qualified immunity in favor of Scott Carvel with respect to Campbell's second cause of action is GRANTED;

7.  Summary judgment and/or qualified immunity in favor of Scott Carvel with respect to Jeffcoat's second cause of action is DENIED;

8.  Summary judgment and/or qualified immunity in favor of Thomas Pryor on Plaintiffs's first, second, third, fourth, fifth, and sixth causes of action is GRANTED;

9.  Summary judgment in favor of Thomas Pryor on Campbell's ninth cause of action is GRANTED;

10. Summary judgment in favor of Thomas Pryor on Jeffcoat's ninth cause of action is DENIED;

11. Summary judgment in favor of Eric Matlock on all of Plaintiffs's causes of action is GRANTED;

12. Summary judgment in favor of the City of Bakersfield on all of Plaintiffs's causes of action is GRANTED.


IT IS SO ORDERED.

**Dated:   July 21, 2006**                           **/s/ Anthony W. Ishii**
0m8i78                                       UNITED STATES DISTRICT JUDGE